RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 12a0399p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT DALE ANDREWS and PATTI
ANDREWS,
    *Plaintiffs-Appellees* (10-6462 & 10-6464),

      *v.*

HICKMAN COUNTY, TENNESSEE, et al.,
               *Defendants*,

KELLY DAVIS; MONICA WRIGHT; CYNTHIA
PRIMM, individually in and in their official
capacities,
        *Defendants-Appellants* (10-6462),

PAUL WADE, individually and in his official
capacity,
        *Defendant-Appellant* (10-6464).

> Nos. 10-6462/6464

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 09-00056—Aleta Arthur Trauger, District Judge.

Argued: October 4, 2011

Decided and Filed:  December 3, 2012

Before:  GIBBONS AND SUTTON, Circuit Judges; and ADAMS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Lindsey O. Appiah, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants in 10-6462. T. William A. Caldwell, ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville, Tennessee, for Appellant in 10-6464. Connie Reguli, LAWCARE FAMILY LAW CENTER, P.C., Brentwood, Tennessee, for Appellees in 10-6462 and 10-6464 **ON BRIEF:** Lindsey O. Appiah, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for

_____

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

Appellants in 10-6462. T. William A. Caldwell, W. Carl Spinning, ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville, Tennessee, for Appellant in 10-6464. Connie Reguli, LAWCARE FAMILY LAW CENTER, P.C., Brentwood, Tennessee, for Appellees in 10-6462 and 10-6464.

GIBBONS, J., delivered the opinion of the court, in which ADAMS, D. J., joined, and SUTTON, J., joined in all parts including the judgment, with the exception of Part IV. SUTTON, J. (pp. 26–27), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Defendants Kelly Davis, Cynthia Primm, Monica Wright, and Paul Wade appeal the district court's decision denying in part their motions for summary judgment.  The district court found that the defendants were not entitled to qualified immunity from plaintiffs Dale and Patricia Andrews' Fourth Amendment claim.  For the following reasons, we **AFFIRM** the district court's decision regarding defendant Paul Wade and **REVERSE** the decision with respect to Davis, Primm, and Wright.

I.

A.

Around August 12, 2008, Defendant Kelly Davis, an assessment worker for the Tennessee Department of Children's Services ("DCS") who serves Hickman County, Tennessee, received a referral regarding allegations of abuse that had been lodged against plaintiffs Dale and Patricia Andrews.  The referral was classified a "Priority Two" or "P2" referral.  A P2 referral indicates that there is still a risk of harm to the child, but the child is "safe for the time being" and a DCS employee should make contact with the child within forty-eight hours.  Davis, however, was not able to make contact within the recommended time period because the address provided in the initial referral was incorrect.  Davis continued to contact the referent in an effort to find the correct address, until the referent told her the correct address on August 27.  On that same day,

Davis was contacted in her office by a new referent[1] regarding conditions at the Andrews' home, and she instructed the referent to call the central DCS hotline in order to file an official referral. This second referral was received at 11:38 p.m. and classified as a priority three referral, which indicates that a DCS employee should make contact within three business days.

Finally in possession of a valid address, Davis conferred with her supervisor who told Davis to visit the home that day. Due to references to the presence of guns in the home in the follow-up conversations with the original referent, and because the site visit was to be carried out "late at night," Davis requested law enforcement to assist her in making the visit. The Hickman County Sheriff's Department dispatched Deputy Kyle Chessor and defendant Paul Wade, who was at the time a reserve officer, to assist with the site visit. According to Wade, the Hickman County officers receive DCS requests for assistance unaccompanied by any further information regarding the level of urgency or a threat code.

Accompanied by two DCS coworkers, Cynthia Primm and Monica Wright, Davis drove to a parking lot closer to the plaintiffs' home in order to meet the Hickman County officers. The uniformed officers arrived in a marked car, and the DCS employees told the officers "what was going on" and "where [they] were going." Wade asserted that because he was seated in the passenger seat of Officer Chessor's car he did not "get a whole lot of what was going on." Davis, Primm, and Wright ("State Defendants") followed the officers to the Andrews's home in a separate vehicle.

At the time of the events in question on August 27, 2008, the Andrews resided in Hickman County with four of their daughters. At approximately 8:30 p.m., the officers and State Defendants arrived at the Andrews's home with the marked sheriff's department vehicle leading the way up the drive.

---

[1]Davis's records indicate that the original referent came to the office along with a new referent on August 27.

Dale Andrews was outside working on a trailer when the defendants arrived. The officers, who were armed, and the State Defendants approached Mr. Andrews. According to the Andrews, the officers introduced themselves and informed Mr. Andrews that the DCS employees wanted to speak with him and interview the children. The officers "got a little hostile" with Mr. Andrews when he asked them to show identification proving they were officers. Mr. Andrews claims that one of the officers told him that he was not allowed to go back into his house unaccompanied by an officer.[2] Because his family had previously experienced an encounter with an individual who was disguised as a police officer, Mr. Andrews explained that he wanted to go inside to get his wife to call a contact in the sheriff's office in order to confirm that the officers were legitimately dispatched to the home. Given the late hour of the visit, Mr. Andrews also wanted the officers to remain outside because he was not certain if his daughters were inside bathing. Andrews accordingly asked the officers to wait outside.

While the officers were speaking with Mr. Andrews outside, Mrs. Andrews was alerted to the presence of the officers by one of her daughters. Mrs. Andrews then called a sergeant in the sheriff's office to confirm that the officers were lawfully dispatched. The sergeant informed her that he needed to speak with one of the officers to confirm the legitimacy of the visit. Mrs. Andrews headed towards the back door of the house to hand the phone off to one of the officers. At the same time, Mr. Andrews was entering the house via the back door to ask his wife to call the sergeant. He encountered his wife coming around the corner from the kitchen into the small laundry room into which the back door opens. The Andrews claim that Mr. Andrews was immediately followed into the house by an officer, closely followed by the three DCS employees, and then another officer, creating a "whoosh of presence" and "flooding" into the home. Finding the officers in front of her, Mrs. Andrews handed the phone to one of the officers in order to allow the sergeant to confirm the legitimacy of the dispatch to the residence. The

---

[2]Mr. Andrews initially stated that he believed that Wade was the one who did most of the talking but acknowledged that he was assuming the identity of the officer who made this statement. During the course of his deposition, Mr. Andrews described the officer who did most of the talking as the "dark-headed' one, and Wade testified that Officer Chessor's hair is noticeably darker than Wade's. Thus, it is likely that Officer Chessor is the officer who spoke with Andrews.

officer spoke with the sergeant and returned the phone to Mrs. Andrews. The sergeant confirmed that the officers had been sent to accompany the DCS employees.

Wade's account of the entrance into the home differs from that of the Andrews. Wade claims that he remained outside the home while Mr. Andrews went inside through the back door, that both Mr. and Mrs. Andrews then came outside, and that the entire party walked around to the front of the house. The party then entered the house through the front door, with the exception of Wade who remained on the front porch except when he stepped inside and "watched what was going on for a few minutes" before stepping back outside.

Once inside the home, the State Defendants took control, and the officers did not give any further orders. The State Defendants requested the opportunity to interview the children individually. The Andrews claim that they granted permission for the interviews because of the presence of the officers and because they feared arrest or losing their children if they were to deny the request. Mrs. Andrews then led the State Defendants to separate rooms where they could interview each child. The Andrews then stepped outside where they were joined by the officers; they recall that one officer stayed with Mrs. Andrews on the porch while the other officer went with Mr. Andrews to the back of the house.

At the conclusion of the interviews, the State Defendants informed the Andrews that they needed to conduct a walk-through of the home as part of their assessment. At this point, the officers indicated that they needed to leave for a shift change. The State Defendants informed the officers that they were comfortable remaining at the house unaccompanied, and the officers left. The parties acknowledge that the Andrews did not ask the officers to leave the property and did not object to their presence beyond Mr. Andrews's request that the officers stay outside while he went inside to get his wife. The Andrews then acquiesced to the walk-through, allowing the State Defendants to go upstairs and showing them where the food was kept in the kitchen. Finally, the State Defendants asked to see any weapons in the home, and the Andrews showed them where guns and ammunition were kept locked up in separate locations in the house. Following

the walk-through, the State Defendants left the home.  No official charges were filed against the Andrews as a result of the referral, and the assessment was closed as "no services indicated."  It is undisputed that the defendants did not have a warrant.

B.

On August 26, 2009, the Andrews filed a lawsuit under 42 U.S.C. § 1983, alleging violations of their Fourth and Fourteenth Amendment rights stemming from the events surrounding the home visit on August 27, 2008.  They also brought state-law claims for abuse of process and conspiracy to commit abuse of process.  The plaintiffs initially named as defendants Cynthia Primm, Kelly Davis, and "Jane Doe" from DCS and Paul Wade and John Doe from the Hickman County Sheriff's Department, as well as Hickman County.[3]  The Andrews later filed an amended complaint substituting Monica Wright for Jane Doe.[4]

On October 21, 2009, the State Defendants filed a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6), which was granted in part and denied in part by the district court.  The district court dismissed the state-law claims against the State Defendants and held that the State Defendants could not be held liable in their official capacities for money damages.

In August 2010, the State Defendants, Wade, and Hickman County filed motions for summary judgment.  The district court denied the motions in part and granted the motions in part, leaving only the § 1983 / Fourth Amendment claims against the State

---

[3]Hickman County Sheriff's Department was also originally named as a defendant but was subsequently dismissed from the suit.

[4]The plaintiffs also sought to substitute Officer Kyle Chessor for John Doe after the one-year statute of limitations on the claims had run, but the district court denied their motion to amend under Federal Rule of Civil Procedure 15.  The court noted that the plaintiffs had only demonstrated a lack of knowledge about the identity of a party instead of the required "mistake concerning the proper party's identity" necessary to allow the amendment to relate back to the date of the original complaint. *See* Fed. R. Civ. P. 15(c)(1).

Defendants and Wade.[5]  The individual defendants all claimed they were entitled to qualified immunity from the plaintiffs' constitutional claims.

The district court first rejected the State Defendants' claim to qualified immunity from the Andrews' Fourth Amendment claim.  The court concluded that the State Defendants were not entitled to qualified immunity because "the right at issue is clearly established," and due to "the absence of evidence that an exception to the warrant requirement applies, and the undisputed fact that the State Defendants entered and searched the plaintiffs' property without a warrant."

Second, the district court denied Wade's motion for summary judgment on the Andrews' Fourth Amendment claim.  The court rejected Wade's argument that his intrusion into the home did not violate the plaintiffs' Fourth Amendment rights because it was consensual, *de minimis*, and not unreasonable.  Thus, the district court found that Wade was not entitled to qualified immunity.

Both Wade and the State Defendants filed timely interlocutory appeals challenging the district court's denial of their qualified immunity claims.  We address their claims in turn.

II.

We review a district court grant of summary judgment *de novo*.  *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a "properly supported motion for summary judgment," the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* (internal

---

[5]Summary judgment on the Andrews' municipal liability claim was granted in favor of Hickman County. The state-law abuse of process and civil conspiracy claims against Wade were also dismissed on summary judgment.

quotation marks omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party.  *Matsushita*, 475 U.S. at 587. Likewise, challenges to decisions regarding qualified immunity made by the district court are questions of law subject to *de novo* review.  *Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2003).

## III.

Wade raises two grounds to support his argument in favor of qualified immunity. First, Wade argues that his actions were not objectively unreasonable in light of clearly established Fourth Amendment rights because a reasonable officer facing the same factual scenario would have thought that consent or exigent circumstances applied to justify entry into the home.  Second, Wade asserts that his actions were *de minimis* and did not rise to the level of a violation of the Fourth Amendment.  Accordingly, he argues that the district court improperly found that a constitutional violation had occurred.

## A.

The doctrine of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine focuses on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law" to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."  *Harlow*, 457 U.S. at 818.

We review district court decisions on qualified immunity as follows:

First, we determine whether based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2010) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). Thus, qualified immunity applies "unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The inquiry into whether a right was clearly established must be conducted "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As a result, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . [and] in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. Given the context-specific nature of the inquiry, there are "limitations upon the extent to which a court may rely on holdings in contexts other than the one being considered to demonstrate that a principle has been clearly established." *Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1176 (6th Cir. 1988). The plaintiff has the burden of demonstrating that the law was clearly established at the time of the challenged conduct. *See Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996). When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal. *See Masters v. Crouch*, 872 F.2d 1248, 1251–52; *Seiter*, 858 F.2d at 1177.

B.

A threshold question in evaluating a qualified immunity issue is whether the facts alleged show that the officer's conduct violated a constitutional right. *See Saucier*, 533 U.S. at 200. The Fourth Amendment protects against unreasonable searches and

seizures. The Supreme Court has recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Thus, a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

It is clear that Wade entered the Andrews' home without a warrant. Thus, Wade must demonstrate that an exception to the warrant requirement applied in order to establish that there was no constitutional violation. Wade first argues that his entry into the Andrews' home is excused by consent. A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The consent to search must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (citing *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)). The burden to establish that the exception applies is on the officer invoking consent. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Tarter v. Raybuck*, 742 F.2d 977, 980 (6th Cir. 1984) (burden on school official claiming student consented to search).

Officer Wade approached Mr. Andrews with Officer Chessor, showed his identification to Andrews, and was present when Officer Chessor and Andrews discussed whether Andrews could go into the house to have his wife call the sergeant to verify that the officers were legitimately dispatched. Although Wade claims that he did not hear the exchange between Chessor and Andrews, when construed in the light most favorable to the Andrews, as we must at this stage, the facts indicate that Wade was present when Mr. Andrews explained that he had to go into the house and that the officers were not to follow him. Although Wade recalls only stepping inside the Andrews' front door while the interviews were being set-up and conducted and observing the events for a few minutes, Mrs. Andrews recalls Wade entering the house

through the back door along with the State Defendants and Officer Chessor. Viewing the facts in favor of the Andrews, Wade entered the home after Mr. Andrews told him to remain outside. Such an entry into the home cannot be justified on the basis of consent.

Wade next argues that even if there was no consent, this court should find that exigent circumstances existed to make his entry into the home reasonable. Exigent circumstances can excuse a warrantless entry into a home. *See Brigham City*, 547 U.S. at 403 (recognizing emergency aid exception); *Ingram v. City of Columbus*, 185 F.3d 579, 587 (6th Cir. 1999). A search without a warrant may be excused due to exigent circumstances if a suspect is believed to "pose[] an immediate threat to arresting officers or to the public." *Ingram*, 185 F.3d at 587.

Viewing the record in the light most favorable to the Plaintiffs, Wade entered the Andrews' home after being asked to wait outside. Although Mr. Andrews may have been less than welcoming to the officers and the State Defendants, there is no suggestion that he posed an immediate threat to the officers, the State Defendants, his family, or himself. We have previously found that exigent circumstances did not exist when police officers responded to a "shots fired call" at a residence and observed a suspect inside a residence holding what appeared to be a gun because no threats had been made, nor a crime committed in the officer's presence. *United States v. Saari*, 272 F.3d 804, 812 (6th Cir. 2001). Wade did not describe seeing Mr. Andrews make any furtive movements, menacing gestures, or verbal threats, and Wade did not indicate that Mr. Andrews possessed a weapon. Indeed, Wade's own testimony indicates that he had very little information (if any) about the original abuse referral and any additional information received by DCS. Wade admits that when he and officer Chessor met the State Defendants at the parking lot and got the information about the Andrews site visit, he did not hear much about what was going on because he was in the passenger seat of the car. Thus, it is unlikely that Wade knew about Davis's concerns about guns in the home, making it even less likely that he could believe that Andrews posed a threat to Chessor,

the DCS employees, or anyone else inside the home.  On this record, a reasonable jury could find that Wade has not established exigent circumstances.

Finally, Wade argues that his actions were *de minimis* and thus qualify for an exception where conduct that technically qualifies as a warrantless search or seizure may be found reasonable and thus excused due to the minor nature of the violation.  The *de minimis* rationale has been recognized in limited circumstances.  *See, e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 125 (1984).  Wade cites *Illinois v. McArthur*, 531 U.S. 326 (2001), to support his claim that his intrusion was *de minimis* and reasonable.  However, *McArthur* is clearly distinguishable from Wade's alleged conduct.  *McArthur* involved the temporary seizure of an individual and a trailer while law enforcement officers obtained a search warrant.  The officers had been told by the individual's wife that she had just seen the individual in question hide drugs in the trailer in which he lived.  *Id.* at 329.  An officer then proceeded to prevent the individual from reentering the trailer for the two hours it took another officer to obtain a warrant.  *Id.*  Unlike the officer in *McArthur*, Wade and Chessor did not enter the Andrews' home to preserve the *status quo* while a warrant was sought.  Wade had no intention of seeking a warrant or preserving evidence when he stepped into the Andrews' home.  In addition, Wade's entry into the home was not *de minimis*.  Under either his account or that of the Plaintiffs, he fully entered the Andrews' home, unlike the officer in *McArthur* who remained in the doorway observing the individual when he was allowed to reenter the trailer for cigarettes and to use the phone.  *See id.*  Further, Wade cannot rely on cases such as *United States v. Jacobsen*, 466 U.S. 109 (1984), which held that the destruction of a small amount of cocaine during a field test of the substance was a *de minimis* seizure, because his violation is an invasion of a different degree.  Indeed, even in *Jacobsen* the Supreme Court emphasized that, despite its holding, "where more substantial invasions of constitutionally protected interests are involved, a warrantless search or seizure is unreasonable in the absence of exigent circumstances."  466 U.S. at 125 n.28.  The Court cited *Payton v. New York*, 445 U.S. 573 (1980), and *Steagald v. United States*, 451 U.S. 204 (1981), to support the proposition, suggesting that cases

implicating warrantless in-home searches and arrests are not appropriate for *de minimis* arguments. *See id.*

Wade carried out a warrantless, non-consensual entry into the Andrews' home. As *Payton* instructs, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590. Viewing the record in the light most favorable to the Andrews, a violation of the Andrews's Fourth Amendment right to be free from unreasonable searches and seizures has been shown.

## C.

The next step in the qualified immunity analysis requires us to ask whether the right was clearly established at the time of the officer's conduct. The right to be free from a warrantless in-home search is clearly established by the Fourth Amendment and Supreme Court case law interpreting it: "[w]ithout a warrant or consent, searches or seizures inside the home are upheld only 'under extraordinary circumstances,' because 'the freedom from armed intrusions of the home outside the judicial process, without prior approval by a judge or magistrate . . . is one of our most basic civil liberties.'" *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005) (quoting *United States v. Chambers*, 395 F.3d 563, 565, 569 (6th Cir. 2005); *Payton*, 445 U.S. at 586. Thus, the dispositive inquiry is whether a reasonable officer could have believed that Wade's warrantless search was lawful, in light of the clearly established law. *See Anderson*, 483 U.S. at 641. An official will be immune if "officers of reasonable competence could disagree on whether the conduct violated the plaintiff's rights." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994) (quoting *Gossman v. Allen*, 950 F.2d 338, 341 (6th Cir. 1991) (internal quotation marks omitted)).

Wade is therefore entitled to qualified immunity from suit if it would be objectively reasonable for an officer faced with the same circumstances to conclude that the warrantless entry was excused by consent, the *de minimis nature* of the intrusion, or exigent circumstances.

Addressing the consent argument first, the facts presented do not lend themselves to a finding that a reasonable officer would have thought that the Andrews agreed to entry by the officers. Here, Dale Andrews has testified that he explicitly told the officers not to follow him into the house. There is a dispute between the parties as to whether or not Wade heard this instruction; however, Wade admits that he was present during the conversation with Mr. Andrews and that he responded to Mr. Andrews' request for identification. Therefore, viewing the facts in the light most favorable to the plaintiffs, a reasonable officer would not have believed that consent had been obtained after Dale Andrews explicitly told the officers to remain outside. This conclusion is buttressed by Mr. Andrews' testimony that he told the officers "you're not going in my house this time of night . . . you're not walking in there" *after* one of the officers told him "you can't go back in your house without me." Thus, Andrews clearly asserted that he was not agreeing to police entry into his home. Despite this, the officers came "barging" in right after him into the mud room. Crediting the Andrews' account of the circumstances surrounding the entry into the home, it is clear that a reasonable officer would not have believed that consent to enter the home had been given. We agree with the district court that a reasonable jury could find that Wade did not have consent to enter the home.

Although he did not raise this argument in his motion for summary judgment, Wade argued on appeal that a reasonable officer would have believed that Dale Andrews posed an immediate threat to Deputy Chessor, thus creating exigent circumstances to support the warrantless entry. Wade cites his claimed lack of knowledge about the basis for his presence at the Andrews' home, the fact that it was nighttime, and the fact that Dale Andrews appeared agitated as a basis for finding that his conduct was reasonable. In essence, he argues that, because he was operating with limited information, he could then assume the worst about the threat that Dale Andrews posed to Officer Chessor when the parties proceeded into the home. However, this invocation of exigent circumstances based on a threat to officer safety is without merit. To support his claim of exigent circumstances, Wade must be able to identify specific facts which, combined with reasonable inferences from those facts, give rise to the conclusion that the warrantless intrusion was appropriate. *See United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir.

1984). Instead, Wade argues that because of his lack of information a reasonable officer would have been put on notice that an immediate threat to Deputy Chessor and the DCS employees existed. However, given the facts of the case, where the interaction between Dale Andrews and the officers was at most unfriendly or tense and where there was no visible weapon in Andrews' possession, nor was a reference made to a weapon or any violence, a reasonable officer would not be able to conclude that there was an immediate threat to officer safety sufficient to justify entering the home.

Finally, Wade argues that a reasonable officer would have found his entrance into the home a *de minimis* intrusion that does not give rise to a constitutional violation. However, under clearly established law, the line has been drawn at the door to a person's residence, and an officer may enter only with a warrant, consent, or qualifying exception to the warrant requirement under exigent circumstances. *See Payton*, 445 U.S. at 590. A reasonable officer confronted with the circumstances before Wade on the night of August 27, 2008, would not have assumed that walking into the Andrews' home would be a *de minimis* intrusion. There was no attempt to secure the premises while a search warrant was obtained, which helped justify the *de minimis* intrusion in *McArthur*. 531 U.S. at 332–33. Wade's entry was *de minimis* only in the sense that it was limited temporally and he did not personally conduct the investigation inside the home. However, we doubt that a reasonable officer would be likely to conclude that he may step into a home without a warrant so long as he stays quiet and draws little attention to himself.

Accordingly, we find that because a reasonable officer could not have believed that Wade's actions were lawful in light of clearly established law, the district court properly denied Wade's motion for summary judgment on the grounds of qualified immunity.

IV.

The State Defendants also contend that the district court erred in denying them qualified immunity. The State Defendants first argue that the Andrews have failed to

carry their burden to establish that the State Defendants are not entitled to immunity for their actions.  Second, the State Defendants argue that the district court erred in finding that *Jordan v. Murphy*, 145 F. App'x 513 (6th Cir. 2005), defined the contours of the Fourth Amendment as applied to social workers in this circuit.  Finally, the State Defendants contend that even if the contours of the Fourth Amendment as applied to social workers were clearly established, they are still entitled to qualified immunity because they acted reasonably.

The Andrews respond with two arguments: first, that *Jordan* does provide guidance as to the application of the Fourth Amendment to social workers and that other district court decisions after *Jordan* have declined to recognize a social worker exception to the Fourth Amendment; and, second, that the State Defendants did not act reasonably in entering and then searching the home.

A.

As discussed above, the Fourth Amendment guarantees the right to be free from unreasonable searches and seizures by government officials.  U.S. Const. amend. IV. The parties do not dispute that the State Defendants entered and searched the Andrews' home without a warrant.  Whether there was a constitutional violation thus turns on whether the conduct at issue was governed by the Fourth Amendment, and if so, whether it was reasonable despite the absence of a warrant.

The State Defendants argue that while the Andrews have asserted facts that taken as true, "may establish a formulation of a general Fourth Amendment claim," they have failed to assert sufficient facts to establish that "a clear violation of the Fourth Amendment as it applies to social workers has occurred . . . ."  Although the State Defendants do not cite any authority for their contention, their argument seems to imply that social workers engaging in their statutorily mandated investigative functions are not governed by the same requirements of the Fourth Amendment that apply to law

enforcement officers or other state actors.[6] If their implication is that social workers are not state actors for the purposes of the Fourth Amendment, the Supreme Court has established that the Fourth Amendment's restrictions on unreasonable searches and seizures extend well beyond the police:

> [T]he Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action"—that is, "upon the activities of sovereign authority." Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities . . . . Because the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.

*New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (internal citations omitted). Thus, the presumption appears to be that any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply.

In other circuits, defendant caseworkers and social workers have unsuccessfully attempted to argue that the Fourth Amendment should not apply to their actions when entering homes to investigate allegations of child abuse. *See, e.g.*, *Calabretta v. Floyd*, 189 F.3d 808, 816–18 (9th Cir. 1999); *Good v. Dauphin Cnty. Soc. Servs.*, 891 F.2d 1087, 1094 (3d Cir. 1989). In *Calabretta*, the argument that the Fourth Amendment did not apply to social worker investigations was partially based on a claim that there should be a child welfare exception to the Fourth Amendment. The argument invoked *Wyman*

---

[6]The State Defendants do not cite any specific provisions of the Tennessee Code regarding the statutorily mandated investigations conducted by DCS. However, one of the statutory provisions governing DCS abuse, neglect, and sexual abuse investigations provides that:

> If admission to the places, facilities or homes of the entities or persons involved in the care . . . of the child is denied or delayed for any reason, the chancery, circuit or juvenile court of the county where the entity or person is located shall, upon cause shown by the department of children's services in investigations of abuse or neglect or sexual abuse . . . immediately, by ex parte order, direct the persons in charge of such places, facilities or any persons having responsibility for the care, supervision, instruction or treatment, of the child . . . to permit entrance for . . . inspection of the premises . . . .

Tenn. Code Ann. § 37-5-512(b).

*v. James*, 400 U.S. 309 (1971), where the Supreme Court held that a caseworker entry into a home pursuant to a New York state aid to dependent children program was not a "search" in the Fourth Amendment meaning of the term, for support. *Calabretta*, 189 F.3d at 816. The Ninth Circuit rejected this argument, distinguishing *Wyman* as a situation where a state was allowed to make receipt of a requested welfare benefit contingent on the grant of entry for a search intended to confirm that the monies were being used in the recipient child's interest, where the entry under the state program was of a limited and consensual nature, and the requirement applied to all recipients. *Id.*

Although this court has not yet had occasion to definitively address this issue, other courts have found that the Fourth Amendment governs entries and searches of homes made by social workers. *See, e,g.*, *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 420–24 (5th Cir. 2008) (holding Fourth Amendment governs social worker entry into home to investigate possible child abuse and considering and rejecting special needs exception in the same context)*; Roska v. Peterson*, 328 F.3d 1230, 1242, 1249–50 (10th Cir. 2003) (holding that Fourth Amendment governs social worker warrantless entry and search of a home to investigate child welfare concerns but noting that lesser Fourth Amendment standard might apply to social workers in other contexts, and possible application of special needs exception for warrantless inspections of the safety of a child's conditions when the child is already in the children's services system); *Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th Cir. 1993) (engaging in Fourth Amendment reasonableness analysis, but noting that lesser scrutiny applies to non-criminal "investigative home visits" by social workers). Given the presumption that state actors are governed by the Fourth Amendment and the sanctity of the home under the Fourth Amendment, we agree that a social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement. This would simply mean that social workers would have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes. Alternatively, social workers, like police officers, are entitled to rely upon information they receive from other officers, and are "insulate[d] . . . from civil liability

in the event the information relied upon [is] defective." *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 656 (6th Cir. 2006).

Given that the Fourth Amendment's strictures apply to social worker actions, the Andrews have asserted a violation of their constitutional right to be free from unreasonable searches unless an exception to the warrant requirement is established. Construing the facts in the light most favorable to the Andrews, the State Defendants have not demonstrated that an exception to the warrant requirement applies. The State Defendants have not directly argued that exigent circumstances existed or that the Andrews consented to the entry; instead, their argument focuses on the assertion that their entry was reasonable. However, for the same reasons that Wade could not invoke exigent circumstances, the State Defendants' would also be unable to establish such an exigency to excuse their entrance into the home. There was no indication once on the scene that the children were in imminent danger of physical harm, the referral was a "priority two" and thus indicated no immediate risk of harm, and there were no direct references to or visual sightings of weapons or dangerous conditions on the property. Moreover, the State Defendants did not directly obtain consent to enter the home, and they do not argue that consent to enter the home actually was given. Nor do they argue that they believed, reasonably or otherwise, that consent had been given.

## B.

Again, government officials are entitled to summary judgment based on qualified immunity if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Therefore, even if we find a constitutional violation, as here, a government official is still "entitled to qualified immunity unless a reasonable officer would know that [his] alleged conduct violated a clearly established federal right." *Crocket v. Cumberland Coll.*, 316 F.3d 571, 583 (6th Cir. 2003). The State Defendants argue that it was not clearly established at the time of their actions that social workers may not enter a home without a warrant or an applicable exception to the warrant requirement. Both the district court and the Andrews invoke *Jordan*, 145 F. App'x 513, to demonstrate that it

was clearly established that the warrant requirement applies to social workers and that the State Defendants violated a clearly established right.

1.

The Supreme Court has not expressly held that the Fourth Amendment prohibition on warrantless searches of homes does or does not apply to social workers carrying out investigations regarding the welfare of children. *See Jordan*, 145 F. App'x at 517 n.2; *cf. Camreta v. Greene*, 131 S. Ct. 2020, 2026–27 (2011) (dismissing appeal regarding social worker's alleged violation of child's Fourth Amendment rights as moot). Following the order of inquiry outlined in *Masters*, we must examine whether our own decisions have addressed the issue in order to ascertain whether the law was clearly established at the time the State Defendants entered the Andrews' home. 872 F.2d at 1251–52.

In *Jordan*, a social worker with the Lucas County Children Services Board in Ohio was assigned to investigate a report of possible neglected children. 145 F. App'x at 515. The report indicated that the home was in "deplorable condition" and the adult in the home was "caring for twenty-five children." *Id.* The social worker went to the home and met two police officers there. One of the police officers had been to the home earlier in the day to investigate a complaint about the condition of the premises and told the social worker that the home was "filthy and full of trash." *Id.* After their knocks at the front door went unanswered, the officers and the social worker entered the home through a side door. *Id.* The social worker and police officers then proceeded to remove the children from the home. *Id.* Although the officers did not have a warrant, the social worker testified that after speaking with the officers about the conditions that had been observed in the home, the "personnel at the scene" were of the belief that the children in the home were in immediate danger and "removal was necessary to prevent immediate physical harm." *Id.* The homeowner brought a civil damages suit against the officials asserting that her Fourth Amendment rights were violated by the warrantless search of the home. *Id.* at 517.

In reviewing the social worker's claim of qualified immunity, this court "assume[d] that [p]laintiffs Fourth Amendment rights were violated." *Id.* In a footnote the court observed that while "neither the Supreme Court nor this Court have explicitly held that the Fourth Amendment does not create a social worker exception, . . . other circuits have so held." *Id.* at 517 n.2 (internal citation omitted) (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003); *Roska*, 328 F.3d at 1240; *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003); *Walsh v. Erie Cnty. Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 746–47 (N.D. Ohio 2003)).

*Jordan* then proceeded to consider whether the right was clearly established by analyzing whether "a case worker in [the defendant's] position objectively would have understood that she 'was under an affirmative duty to have refrained from such conduct.'" *Id.* at 517 (quoting *Bills v. Aseltine*, 52 F.3d 596, 603 (6th Cir. 1995)). The *Jordan* panel concluded that a reasonable social worker "under similar circumstances would have deferred to the police officers' conclusion" that immediate entry was required to prevent imminent physical harm. *Id.* at 518. While the panel recognized the authority of social workers to enter a home under certain circumstances, it also noted their duty to cooperate with law enforcement officers and the expertise of law enforcement officers in making Fourth Amendment decisions. The court reasoned that "[c]ase workers should not have to second guess officers' decisions, particularly where the police have told them that children are in imminent physical danger." *Id.* Ultimately, based on the social worker's reasonable reliance upon the police officers, "her statutory duty to investigate abuse and neglect, and her statutory duty to cooperate with the police," the court concluded that "a reasonable case worker in [the social worker's] position would not have understood her actions as violating clearly established law." *Id.*

While *Jordan* is not binding precedent, it is the only case from our court that bears on the issue of whether the reasonable social worker, facing the situation in the instant case, would have known that her conduct violated clearly established law. Yet,

*Jordan* fails to give clear guidance to the social worker faced with the decision to enter the Andrews home.

First, the *Jordan* footnote referencing the views of other circuits does not endorse them, explicitly or otherwise. The footnote does not hint at whether the court believes a social worker exception to the application of the Fourth Amendment should apply. The footnote is merely an observation about the existence of an issue not explored in *Jordan.* Moreover, the court in *Jordan* concluded, using fairly broad language, that social workers should not "have to second guess" the decisions of officers. *Id.* at 518. Although the court mentions that the officer told the social worker the children in the house were in immediate physical danger—a circumstance not present here—the opinion makes no effort to delineate the situations in which reliance on officers' decisions would be appropriate and those in which it would not. Consequently, a social worker could not determine, based on *Jordan*, whether she might reasonably rely on the officers' decision under the circumstances presented here. In fact, to the extent *Jordan* suggests an answer to the question of whether the social worker could rely on an officer's decision, it suggests that she could do so. *Id.* ("Law enforcement officers have a duty to make, and are accustomed to making, Fourth Amendment decisions. Case workers should not have to second guess officers' decisions, particularly where the police have told them that children are in imminent physical danger."). Quite simply, the reasonable social worker faced with the circumstances of this case could not ascertain from clearly established law the legality of her conduct.[7]

---

[7]A thorough district court opinion, *Walsh v. Erie County Department of Job & Family Services*, 240 F. Supp. 2d 731 (N.D. Ohio 2003), engages in a qualified immunity analysis regarding a claimed violation of the plaintiff parents' and children's Fourth Amendment rights, including a warrantless entry and search of the family's home by a social worker and police officers. *Walsh* found that a constitutional violation had been made out because the Fourth Amendment's mandates apply to all state actors, including social workers, and no exception to the warrant requirement applied on the facts of the case. *Id.* at 746–52. In addition, the court found that the right was clearly established because the social workers could not assume that in the absence of a decision explicitly confirming that the Fourth Amendment applies to social workers, they were free to ignore the basic Fourth Amendment principles that are "clearly articulated and firmly embedded in our constitutional jurisprudence." *Id.* at 758. The court thus concluded that the defendant social workers could not invoke qualified immunity for their warrantless entry and search. The *Walsh* opinion has been followed by a decision from the Eastern District of Tennessee as well as another decision in the Northern District of Ohio subsequent to the date of the challenged actions. *See Baxter v. Daughtery*, No. 5:08-485, 2010 WL 3620247 (E.D. Ky. Sept. 10, 2010); *Kovacic v. Cuyahoga Cnty. Dept. of Children & Family Servs.*, No. 1:05CV2746, 2011 WL 3749396 (N.D. Ohio Aug. 25, 2011).

The instant case was heard in the Middle District of Tennessee, and the *Walsh* decision is not sufficient to put the State Defendants on notice that the right was clearly established. As noted previously,

2.

The State Defendants are entitled to qualified immunity unless a reasonable DCS employee faced with the same circumstances would know that her conduct violated a clearly established federal right. *See Anderson*, 483 U.S. at 640. We turn then to the specific situation faced by the State Defendants. Their actions were not objectively unreasonable so that a DCS employee with knowledge of the *Jordan* precedent would have known that she "was under an affirmative duty to . . . refrain[] from such conduct." *Bills*, 52 F.3d at 603.

Here, Davis received a referral containing allegations of abuse and was required to make a visit to the home in order to investigate the allegations. She had not been able to make the visit to the home within the forty-eight hours designated for contact in P2 referrals, despite her consistent good faith efforts to do so. Thus, by the time she finally tracked down the address, it is reasonable to believe that she might have had more concerns about the children in the home given the lapse in time without contact. The State Defendants were joined by officers at the home. As the Andrews concede, the officers did most of the talking outside of the home. From that point on, however, there are fact questions about the exact circumstances surrounding the entry into the home. There is evidence that the first person to enter the Andrews's home was Chessor—not a State Defendant. Thus, the State Defendants' claim in their brief that they "reasonably relied upon the Sheriff's officers' assessment of the propriety of entry" may have some plausibility. But the State Defendants themselves testified in their depositions that they did not recall that the officers entered the house with them.

In any event, given the lack of clarity of *Jordan*, it was not objectively unreasonable for the State Defendants to enter the home. Although the facts of this case differ from *Jordan*, in that the officers here are not alleged to have had prior first-hand knowledge of the situation inside the Andrews home (as the officer did in *Jordan*), the officers are the ones who took control outside, and attempted to negotiate entrance into

to find a clearly established right, absent extraordinary circumstances, a district court looks to "binding precedent by the Supreme Court, its court of appeals or itself." *Seiter*, 858 F.2d at 1177.

the home with Mr. Andrews. In addition, because the State Defendants had requested assistance from the officers due to the late hour and Davis's belief that there were guns in the home following her conversations with a referent, it was not unreasonable that they would allow the officers to take the lead. Moreover, it was not evident under clearly established law whether the State Defendants were even required to comply with the strictures of the Fourth Amendment. As a result, the State Defendants' conduct here is easily "near enough to the 'hazy' border separating illegal from legal conduct for qualified immunity to attach." *See Bing v. City of Whitehall*, 456 F.3d 555, 571 (6th Cir. 2006).

## C.

As we have explained, the actions of social workers in entering a home are governed by the Fourth Amendment, and we have concluded that no social worker exception applies in such situations. Nonetheless, there is still a question, going forward, about whether social workers can rely upon the actions of police officers in deciding whether they can enter a home, although, to be sure, there is a question of fact in this case about whether reliance on the officers occurred. While we recognize that social workers have a duty to cooperate with police officers and, perhaps, a natural inclination to defer to their decisions, exempting social workers from the Fourth Amendment whenever they rely upon a police officer's actions is tantamount to recognition of a "social worker exception" to the Fourth Amendment's requirements. We join other circuits in recognizing that Fourth Amendment standards are the same, whether the state actor is a law enforcement officer or a social worker. *Gates*, 537 F.3d at 420 ("[I]t is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations."); *Roska*, 328 F.3d at 1250 n.23 ("[A]bsent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody."); *Calabretta*, 189 F.3d at 813 (refusing to "adopt a principle that a search warrant is not required for home investigatory visits by social workers" (internal quotation marks omitted)); *Good*, 891

F.2d at 1094 (treating police officer and social worker defendants identically in analyzing Fourth Amendment claims).

Nonetheless, if social workers cannot be treated better than police officers under the Fourth Amendment, they should not be treated worse, either. Social workers are frequently asked to make decisions based on information provided to them, directly or indirectly, by the police. When social workers rely in good faith on information from police officers which suggests they can enter a home under an exception to the warrant requirement, or can reasonably infer that an exception applies from their actions, they are entitled to rely on that information. *United States v. Hensley*, 469 U.S. 221, 232 (1985) (finding that officers who arrest an individual in reliance on a flyer or bulletin issued by the police "may have a good-faith defense to any civil suit" if that flyer or bulletin contains false information); *Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (noting that police officers "are entitled to assume" that "officers requesting aid" to execute a warrant "offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); *Hardesty*, 461 F.3d at 656; *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003) ("[Plaintiff] cannot prevail in a § 1983 suit" when defendants acted on inaccurate information from police dispatcher prior to making a *Terry* stop). The social workers' position is the same as that of a police officer who reasonably relies on another police officer.

V.

For the foregoing reasons, the denial of qualified immunity to Wade is **AFFIRMED** and the denial of qualified immunity to the State Defendants (Davis, Primm, and Wright) is **REVERSED**.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

SUTTON, J., concurring in part and in the judgment. I join all of Judge Gibbons's opinion except for Part IV. Even as to Part IV, I agree with Judge Gibbons that there is no social-worker exception to the Fourth Amendment. And I agree that the social workers are entitled to qualified immunity.

I see no need, however, to decide whether these social workers violated the Fourth Amendment. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[T]he courts of appeals [have] discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."). All I would say, and all we need to say to resolve this case, is that the social workers could "reasonably [have] believe[d] that [their] conduct complie[d] with the law." *Pearson*, 555 U.S. at 244. First, as Judge Gibbons correctly observes, it was unclear in 2008 whether, and if so how, the Fourth Amendment applied to social workers accompanying police officers to a residence where child abuse was suspected. *See supra* Part IV.B.1. Second, the social workers reasonably relied on the officer's decision to enter the home, whether because the officer's entry confirmed the fear that an exigent circumstance (child endangerment) was afoot or because it confirmed that the officers had obtained consent to enter.

The social workers had no information undermining this reasonable assumption. Although Dale Andrews allegedly told the officers not to come in, nothing in the record indicates the social workers knew that. Everyone agrees that the Andrews never asked the social workers to leave. R.54-5 (Davis deposition) at 88; R.54-6 (Wright deposition) at 35–36; R.54-7 (Primm deposition) at 37, 60–61; R.54-8 (Patricia Andrews deposition) at 57–62; R.54-9 at 26–27 (Dale Andrews deposition). And according to the Andrews, the social workers followed one of the officers into the home. *See, e.g.*, R.54-3 at 7. Absent indications to the contrary, later-arriving police officers as a general matter may assume their colleagues have entered a house for a lawful reason, such as exigent circumstances or consent. *See Turk v. Comerford*, No. 11-3682, 2012 U.S. App. LEXIS

14845, at *34 (6th Cir. July 17, 2012) (granting qualified immunity to officer who entered after other officers because "law-enforcement officers may generally assume that other officers have acted lawfully"); *Sargent v. City of Toledo Police Dep't*, 150 F. App'x 470, 474 (6th Cir. 2005) ("[N]o Fourth Amendment violation occurs when an officer follows a partner inside after the partner has already entered the home."); *cf. Hardesty v. Hamburg Twp.*, 461 F.3d 646, 656 (6th Cir. 2006). There is no reason social workers should be treated differently. In the final analysis, the social workers did not violate any clearly established rights of the Andrews family, and I would leave it at that.