NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0547n.06

No. 13-1050

**FILED**
Jul 22, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BAHAA ISWED, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| PATRICIA L. CARUSO, MARY BERGUIS, | ) | |
| G. RILEY, and WRIGHT WADE, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

**Before: SILER, GILMAN, and GIBBONS, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** The key issue in this civil action brought under 42 U.S.C. § 1983 is whether an inmate in a state prison can recover damages against the prison officials who prevented him from being able to communicate with his overseas family. A jury determined that the four named prison officials unreasonably deprived Bahaa Iswed of his right to communicate and awarded him nominal damages of $1 per defendant, for a total of $4.

The defendants then renewed their motion for judgment as a matter of law, claiming that qualified immunity shielded them from individual liability. Their motion was granted. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

Iswed has been incarcerated by the state of Michigan since 1997.  (R. 188, Transcript, PageID# 1491).   His family lives in Jordan and Romania, and none of them speak English. (R. 188, Transcript, PageID# 1494).  Iswed alleges that from the time he filed a prison grievance in 2005 until the filing of his complaint in 2008, he had periodically sought to call members of his family on the prison telephone system.  (R. 1, Compl., PageID# 5–6)  Specifically, Iswed placed his family's international telephone numbers on his prison telephone call list and attempted to dial the numbers.  (R. 192, Pl. Ex. 11, PageID# 1976)

Iswed demanded an explanation when he was unable to make the telephone calls.  He was variously told in response that the prison's telephone provider would not allow such telephone calls, or that he was not permitted to make such telephone calls because they were international.  (R. 192, Pl. Exs. 11, 12, 13, PageID# 1976–79)  Warden Mary Berguis told him: "You will have to settle for writing to them given the location that would be involved is out of the US."  (R. 192, Pl. Ex. 14, PageID# 1980)  Despite this advice, Iswed's incoming mail was routinely confiscated because the letters to him were written in Arabic.  (R. 192, Pl. Exs. 1–7, PageID# 1967–88)

All of this was purportedly done pursuant to policy directives from the Michigan Department of Corrections.  (R. 188, Tr., PageID# 1542, 1978–79)  These policies permitted telephone calls only to numbers in the United States, Canada, Guam, Mexico, Puerto Rico, and the Virgin Islands.  (R. 192, Pl. Exs. 20, 21, PageID# 1991, 2001)  They also prohibited prisoners from receiving "[m]ail written in code, or in a foreign language that cannot be interpreted by institutional staff to the extent necessary to conduct an effective search.  If facility

staff are not available, the facility head may authorize the use of another reliable interpreter." (R. 192, Pl. Ex. 22, PageID# 2017)

The defendants are current and former Michigan Department of Corrections officers who concede that they carried out these policies. (Appellees' Br. 4) They acknowledge knowing that Iswed could not make telephone calls to his family, but generally deny knowing that he could not communicate with his family by mail. (R. 189 Tr., PageID# 1729–31, 1773–75; 1785–86, 1754–55) Nonetheless, Warden Berguis conceded knowing that Iswed could not communicate with his family by mail when she told him that international telephone calls were prohibited and instructed him to use the mail instead. (R. 189, Tr., PageID# 1779) And the jury determined that Iswed had not been allowed any reasonable means to contact his family. (R. 137, Verdict, PageID# 826)

## B. Procedural background

Iswed sued under 42 U.S.C. § 1983, claiming that the prison officials' actions denying him the right to communicate with his family violated his constitutional rights. The defendants moved to dismiss Iswed's complaint for failure to state a claim, which the district court granted. (R. 4 PageID# 55–68) This court reversed on appeal, holding that Iswed had stated a claim for violation of his First Amendment rights. *Iswed v. Caruso*, No. 09-1245, *3 (6th Cir. Oct. 21, 2009) (Rule 34 Order). The case then proceeded to trial after remand to the district court.

At the conclusion of the defendants' case in chief, they moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. (R. 189, Transcript, PageID# 1844) The district court took the motion under advisement and submitted the case to the jury. (R. 188, Transcript, PageID# 1866) Following deliberations, the jury determined that the defendants had "deprived [Plaintiff Iswed] of his right to reasonable use of the telephone"

and did not "allow Plaintiff reasonable alternative means to exercise his right to contact his family." (R. 137, Verdict, PageID# 825–26) But it awarded him only nominal damages of $1 per defendant, for a total of $4. (R. 137, Verdict, PageID# 826)

Iswed then sought a permanent injunction requiring the prison officials to permit him to make international telephone calls to his family. (R. 141, Motion for Permanent Injunction, PageID# 908) The defendants in turn filed a renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. (R. 146, Renewed Motion for Judgment as a Matter of Law, PageID# 1035) They argued that injunctive relief was improper and that all of them were entitled to qualified immunity. (*Id.*)

The district granted Iswed's motion for a permanent injunction, but also granted the defendants qualified immunity, thus shielding them from liability in their individual capacities for the jury's damage award. (R. 160, Opinion and Order, PageID# 1262–88) It entered judgment accordingly. (R. 160, Opinion and Order, PageID# 1289) The court also granted Iswed "an award of $52,055.56 in attorneys' fees (consisting of $50,214.25 in hourly fees and $1,841.31 in related expenses) and $1,507.01 in costs." (R. 185, Opinion and Order, PageID# 1440)

On appeal, Iswed argues that the district court erred in granting the defendants qualified immunity. The defendants disagree, but do not challenge the district court's imposition of injunctive relief, the award of attorney fees, or the allocation of costs. They also concede their personal involvement and that Iswed suffered a constitutional violation. (Appellees' Br. at 4, 13–14) Accordingly, the parties agree that the sole issue before the court is whether the right that the defendants violated was clearly established by 2005 when Iswed sought to place telephone calls to his family in Jordan and Romania. Iswed frames this right as "reasonable

access to communicate with his family." (Reply Br. at 1) The defendants frame the right as "prison inmates[' ability] to place overseas international telephone calls." (Appellees' Br. at 12)

## II. LEGAL STANDARDS

### A. Renewed motion for judgment as a matter of law

We review de novo the district court's application of Rule 50. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996). But such "de novo review is narrowed by the test for evaluating a renewed Rule 50(b) motion." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 899 (6th Cir. 2004). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Specifically, "[a]fter trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." *Ortiz v. Jordan*, 131 S. Ct. 884, 889 (2011). Accordingly, this court reviews de novo the district court's Rule 50(b) decision on qualified immunity, but views the evidence in the light most favorable to the plaintiff as the nonmoving party.

### B. Qualified immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 134 S. Ct. 3, 4 (2013) (per curiam) (internal quotation marks omitted). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462,

472 (6th Cir. 2013). This court has generally "use[d] a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident." *Id.*

"The burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (internal quotation marks omitted). This inquiry "must be conducted in light of the specific context of the case. [It must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (second alteration in original) (internal quotation marks omitted). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Id.*

## III. ANALYSIS

Iswed argues that this court's decision in *Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994), established the "right to reasonable access to communicate with family." (Reply Br. at 1) The defendants counter that Iswed asserts a "right to make international phone calls," and that *Washington* did not clearly establish such a right. Critically, both parties agree the right that Iswed seeks to assert under *Washington* is subject to "rational limitations." *Washington*, 35 F.3d at 1100. Accordingly, we first address the nature of the right that Iswed seeks to assert and then the limitations that the prison officials imposed on that right.

*Washington* acknowledged that "federal court opinions have previously held that persons incarcerated in penal institutions retain their First Amendment rights to communicate with family

and friends, . . . and have recognized that there is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and [that] such use is protected by the First Amendment." *Id.* (second alteration in original) (internal quotation marks omitted). That is, inmates have a general "right[] to communicate with family and friends," which includes a sub-right to "reasonable access to the telephone." *Id.*

Framed as the defendants pose the issue—whether Iswed had the specific right to make international telephone calls—*Washington* does not clearly establish such a right. But Iswed does not argue that the restrictions on telephone calls to Jordan and Romania were unreasonable per se; he instead argues that they were unreasonable in light of the other restrictions placed on his incoming mail, which had the collective effect of totally denying him the broader right to communicate with his family. And Iswed notes that the jury's verdict included a finding that defendants did not "allow Plaintiff reasonable alternative means to exercise his right to contact his family." (R. 137, Verdict, PageID# 825–26) On this point, Iswed has the better argument. Iswed asserts a right to communicate with his family that includes doing so by telephone, and *Washington* supports such a right.

Nonetheless, the *Washington* court continued,

> an inmate has no right to unlimited telephone use. Instead, a prisoner's right to telephone access is subject to rational limitations in the face of legitimate security interests of the penal institution. The exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions.

*Id.* (internal quotation marks and citations omitted). And Iswed concedes that both his general right to communicate with family and friends and the sub-right to reasonable use of the telephone are "subject to rational limitations in the face of legitimate security interests of the penal institution." *Id.*

*Washington* further holds that in order to determine whether any set of "limitations" is "rational," the government will have to prove either that the regulation is "reasonably related to legitimate penological interests" or "that the regulation furthers an important or substantial governmental interest unrelated to the suppression of expression and that the limitation on First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 1100 n.8 (internal quotation marks omitted) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987), and *Procunier v. Martinez,* 416 U.S. 396, 413 (1974)).

No determination was made by the *Washington* court as to whether the former, rational-basis standard articulated in *Turner* or the latter, intermediate-scrutiny standard articulated in *Procunier* would apply, and we need not so decide today. The key point is that, at a minimum, *Washington* indicates that restrictions on inmate communications would have to pass muster under the rational-basis standard articulated in *Turner*.

> *Turner*, in turn, outlines a four-part test for determining whether a limitation is rational:
>
> several factors are relevant in determining the reasonableness of the regulation at issue. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. . . . A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. . . . Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

482 U.S. at 89–90. Accordingly, we must analyze Iswed's claim in light of *Turner*'s four-part test.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted). In other words, for Iswed to prevail, he must prove that a balancing of the *Turner* factors in 2005 clearly established that the prison officials were violating his constitutional right to communicate with his family.

Neither *Turner* nor *Washington* compels this conclusion. And Iswed points to no cases indicating how such balancing applies in the context of inmate communications with friends and family. He therefore fails to carry his burden. *See Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) ("The burden of convincing a court that the law was clearly established rests squarely with the plaintiff."). Prison officials making this calculus for themselves could therefore have reasonably believed that security concerns justified the restrictions and would outweigh any countervailing considerations. This court in 2009 concluded that the officials were wrong, but this later ruling does not strip the defendants of qualified immunity for their actions taken in 2005.

## IV. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.