SUTTON, Circuit Judge,
dissenting.
Say you are a social worker. You are monitoring an unhappy family unhappy in its own way. After the parents divorce, they begin behaving badly when it comes to custody over their children. The mother, perhaps unfairly, perhaps not, is the immediate focus of concern. Over several years, she has had a series of encounters with social workers and police officers, each raising concerns about her stability and her capacity to care safely for her children. On March 26, 2002, you and five other social workers and officers along with several members of the Kovacic family meet to discuss the situation, and, with your operational silos removed, discuss the risk that the mother might imminently harm the two children, ages 11 and 8. The *703 mother is invited but at the last minute declines to attend. You and the government officials together perceive risks you had not perceived individually. You act. Consistent with two state statutes and a standing order of the juvenile court concerning child endangerment, you remove the two children from the custody of their mother. Within three days, and again consistent with state law, a state court judge holds a hearing. She. finds that the requisite endangerment and emergency existed; requiring the children to remain in state custody. State law provides a right of appeal, but the mother does not exercise it and never challenges the ruling. The children remain in the custody of the State (and a family member) for ten months.
Eleven years later, a federal court of appeals considers whether the two children may recover money damages from you and the other social workers under § 1988 for seizing them in violation of the Fourth and Fourteenth Amendments. At that point, the court is told about the seen risks of a seizure (removal of children from their mother) and cannot be told about the unseen risks of a non-seizure (irreversible harm to the children) because you eliminated that danger. Let the reader be the judge. I for one would grant qualified immunity to the social workers.
Because no one can perceive all risks of government action and inaction, the seen together with the unseen, American law does not lightly second guess the actions of public officials and thus does not lightly allow citizens to sue them after the fact for damages. Judges, the Supreme Court has held, receive absolute immunity from § 1983 actions. (Thank you.) Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Other government officers, generally speaking, receive qualified immunity from § 1983 damages actions. They will not be held liable for constitutional torts so long as “their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If an official “reasonably believes that his or her conduct complies with the law,” the accent being on “reasonably,” qualified immunity applies. Pearson v. Callahan, 555 U.S. 223, 245, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The defense prompts a present-tense and a past-tense inquiry: Does the seizure violate the requirements of the Fourth and Fourteenth Amendments? If so, were those requirements clearly established at the time of the seizure — here in 2002? I would skip the first question, id. at 236, 129 S.Ct. 808, and answer no to the second.
1. Qualified immunity from the Fourth Amendment claim. Even if a triable issue of fact exists over whether the social workers violated the Constitution by taking custody of the children on March 26, hardly self-evident on this record, they could be held liable only if the right were clearly established at the time of the violation. Three considerations convince me that the social workers could reasonably think in 2002, when this long-ago seizure occurred, that their actions were legitimate.
First, before considering the state of Fourth Amendment law in 2002, it is worth remembering that the social workers had at least two sources of state authority for doing what they did — a situation hardly suggestive of actions by the “plainly incompetent.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The relevant Ohio statute, entitled “Taking child into custody,” offers at least two standards relevant to this case. One subsection requires an exigency before officers or social workers may remove a child in the absence of a court order. It *704 allows removal when “necessary to prevent immediate or threatened physical or emotional harm.” Ohio Rev.Code § 2151.31(A)(3)(a)-(c). The social workers complied with all of the procedural requirements of this law. They followed a judicial standing order entered under the statute, obtaining permission from the prosecutor to seize the children. They filed the requisite complaint after the seizure. And within three days of the seizure, a state court judge found that the children belonged in state custody. Even if the majority, eleven years later, were right that a reasonable jury could find that the requisite exigency did not exist, I am hard pressed to understand how these could be the actions of the “plainly incompetent,” the “plainly unreasonable” or whatever other phrase we use to describe those denied qualified immunity. Most notably, the majority does not hold that this statutory scheme is unconstitutional under the Fourth Amendment, making it exceedingly strange that the social workers could be found liable as a matter of law under the Fourth Amendment for complying with the only clearly established requirement in the case. What the majority says in response — “The relevant question is whether there was exigency, not probable cause,” Maj. Op. at 696 — does not come to grips with the problem. Under this provision of the statute, an exigency was required, and the state court found one — all at a time when the evidence was fresh and all by way of a decision the plaintiffs never challenged.
The other subsection of the Ohio statute also authorized the social workers’ conduct. Then and now, it allows social workers or officers to remove a child when they have “reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child.” Ohio Rev. Code § 2151.31(A)(6)(a). For reasons of its own, the Ohio General Assembly did not provide an exigency requirement with respect to this subsection. All that the subsection requires is endangerment. And no one can fairly doubt that the social workers had ample evidence of endangerment before the seizure: They had heard from one of the children (Danny) and others that the mother (Nancy Kovacic) had hit the children on different occasions and was failing to provide medication and clothing for visits with the father (Tom Kovacic), and the police officers underscored the potential fragility of Nancy’s mental state. On this statutory and evidentiary record, it is hard to say that the social workers’ removal of the two children was ultra vires. An Ohio statute allowed them to do just what they did.
No doubt, a state law might empower conduct that nonetheless violates the Federal Constitution. And from the vantage point of 2013, that is true here: The current requirements of the Fourth Amendment and this second provision (§ 2151.31(A)(6)) cannot co-exist. But until a court declares the statute unconstitutional, which no court has done and which the majority is unwilling to do (directly) today, it surely favors the government official in a qualified immunity case that a state law authorized his or her conduct. Cf. Pierson, 386 U.S. at 557, 87 S.Ct. 1213. Only if the law is “so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws” will the qualified immunity veil be pierced. Michigan v. DeFillippo, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).
As to the second provision, even if the social workers lacked evidence that the children were immediately endangered, they could reasonably think that these children were endangered and they could reasonably think that this authorization to protect the safety of a child was not a *705 “gross[ ]” violation of the Fourth Amendment. Id. When a state statute expressly authorizes conduct, when it remains good law eleven years later and when it is not grossly unconstitutional, that provides a sound explanation for granting qualified immunity.
The majority resists dealing with subsection (6) because, it says, “[t]here is no evidence that the social workers in this case entertained § 2151.31(A)(6) as a possible basis for removal at any point in the discussions or proceedings.” Maj. Op. at 701. But it is core Fourth Amendment law that we do not examine the actual reason officers seize someone. “[T]he fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify ' that action.” Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); see Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); see also Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). Surely, if an officer may stop someone for a bad reason but an objectively good one permits — and will uphold — the stop, a social worker may subjectively rely on one approach for seizing a child and use that approach and another (not considered at the moment) to justify her actions.
Second, the state of Fourth Amendment law with respect to what all can agree is a difficult issue — how to balance the safety of children from irreversible harm against the unforgettable harm of removing children from their family — was unclear in 2002. Our circuit had, and still has, little case law about how the Fourth Amendment applies in the context of child abuse. In Jordan v. Murphy, 145 Fed.Appx. 513 (6th Cir.2005), a case involving events in 1998, we observed • that “neither the Supreme Court nor this Court have explicitly held that the Fourth Amendment does not create a social worker exception,” which is to say for better or worse we had not yet decided whether the Fourth Amendment applied to a child-safety seizure. Id. at 517 n. 2. In that case, we granted qualified immunity to a social worker for a warrant-less entry into an allegedly neglected child’s home when a police officer concluded that “the condition of the house required immediate intervention.” Id. at 517. Just last year, we relied on this dearth of case law in granting qualified immunity to social workers for a warrant-less entry in 2008, noting that “Jordan fails to give clear guidance” about the issue. Andrews v. Hickman Cnty., 700 F.3d 845, 861 (6th Cir.2012) (calling Jordan “the only case from our court that bears on the issue of’ social worker liability under the Fourth Amendment).
Nor, most importantly, was it fair to assume in 2002 that the Fourth Amendment meant the same thing with respect to all warrantless seizures and entries— whether the official was engaged in traditional law enforcement (trying to prevent the destruction of drugs or to seize a criminal suspect) or was engaged in traditional social services (trying to prevent a parent from irreversibly hurting a child). See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 661, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (discussing “special needs” exceptions to the warrant requirement). Protecting children often differs from solving crimes, see Gates v. Tex. Dep’t of Protective & Reg. Servs., 537 F.3d 404, 427-28 (5th Cir.2008), and there is no indication in the record that the social workers here were engaged in a criminal investigation. As Andrews and Jordan indicate, the law in this area was' far from clear in 2002, making it understandable and reasonable for a social worker (potentially) to find himself on the wrong side of the constitu *706 tional line after a seizure, particularly eleven years after the seizure.
All the majority says in response to Andrews and Jordan is that they involved entries, not seizures. But both cases could lead a reasonable social worker to think that the Fourth Amendment did not apply to them at all — that the Fourth Amendment did not regulate entries or seizures and that, even if it did apply, the rules for immediately seizing illicit drugs differed from the rules for seizing endangered children. See Andrews, 700 F.3d at 863 (“[I]t was not evident [in 2008] under clearly established law whether the [social workers] were even required to comply with the strictures of the Fourth Amendment.”); Jordan, 145 Fed.Appx. at 517 n. 2. If the majority were right — that the baseline presumption for the clearly established inquiry is that the Fourth Amendment applies to everyone, including social workers, in the absence of contrary case law — Jordan was incorrectly decided. But that should be our problem and our mistake, not the social workers’ problem and their mistake.
Just as our court in the past has sent mixed messages on this score, so have other circuits. By 2002, three circuits had concluded to varying degrees that social workers did not get special Fourth Amendment treatment. See Mabe v. San Bernardino Cnty., 237 F.3d 1101, 1108 (9th Cir.2001); Brokaw v. Mercer Cnty., 235 F.3d 1000, 1010 (7th Cir.2000); Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir.1999). Even this conclusion, however, did not come easily. Tenenbaum, for example, struggled with whether a “special needs” exception applied to social workers, and “refrain[ed] from deciding .categorically ... that the removal of a child of whom abuse is suspected is not a ‘special needs’ situation.” 193 F.3d at 604.
Other circuits have charted other paths. As of 2002, the Fifth Circuit decided not “to choose between applying the traditional [and] the special needs doctrines” in this setting. Roe v. Tex. Dep’t of Protective and Reg. Servs., 299 F.3d 395, 401 (5th Cir.2002). And the Tenth Circuit waited until 2003 to explain that preventing child abuse was not a “special need that renders the warrant requirement impracticable.” Roska v. Peterson, 328 F.3d 1230, 1241 (10th Cir.2003). Some circuits suggested that suspicions of past abuse, rather than impending abuse, might be enough for an unauthorized removal, which would have covered the social workers here. See Hatch v. Dep’t for Children, 274 F.3d 12, 22 (1st Cir.2001) (“[T]he Constitution allows a case worker to take temporary custody of a child, without a hearing, when the case worker has a reasonable suspicion that child abuse has occurred.”) (emphasis added); Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1126 (3d Cir.1997) (stating that removal is allowed when a social worker has “a reasonable suspicion that a child has been abused”).
Nor, even if we overlook the state court’s exigency finding in this case, would we be the first circuit to look at the state of the law in 2002 (or thereabouts) and decide that social workers who removed children without an exigency nonetheless deserved qualified immunity. Gates, 537 F.3d at 426; see also Roska, 328 F.3d at 1249-50 (finding exigency requirement for seizure of potentially abused children not clearly established); see, e.g., Mueller v. Auker, 700 F.3d 1180, 1189 (9th Cir.2012); Martin v. St. Mary’s Dep’t of Soc. Servs., 346 F.3d 502, 507 (4th Cir.2003); Hatch, 274 F.3d at 25. That is in part because the “amorphous” balance of the fragile and deeply sensitive interests involved makes it “difficult, if not impossible, for officials to know when they have violated ‘clearly established’ law.” Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir.1992). So difficult, *707 in fact, that a court that denied qualified immunity to social workers still took pains to explain that most “social workers and other state actors who cause a child’s removal are entitled to qualified immunity because the alleged constitutional violation will rarely — if ever — be clearly established.” Brokaw, 235 F.3d at 1023.
To top it off, the Supreme Court granted certiorari two years ago to resolve a related question: Whether “traditional warrant/warrant-exception requirements,” a “balancing standard” or a “special needs” standard applies to in-school seizures of potentially abused children. See Petition for Writ of Certiorari, Camreta v. Greene, — U.S.-, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (Nos. 09-1454/1478). The Court found the case moot, 131 S.Ct. at 2036, and left that question and related questions up in the air — in 2011 and, it follows, in 2002.
As with Andrews and Jordan, the majority attempts to distinguish these other cases on grounds on which no reasonable social worker would think to distinguish them. A lack of clarity about whether and when a social worker can enter a home without a warrant suggests a lack of clarity about whether and when a social worker can seize a child without a warrant. A question about whether and when a social worker violates the Fourteenth Amendment by taking a child without holding a hearing suggests more questions about whether and when a court order is also necessary. At least two provisions of the Constitution (the Fourth and Fourteenth Amendments) regulate at least two stages of a social worker’s investigation (searches and seizure), and a reasonable social worker could rely on precedents involving each relevant permutation. See, e.g., Gates, 537 F.3d at 428-29 (citing procedural due process cases in determining relevant Fourth Amendment standard for child removal); Roska, 328 F.3d at 1249-50 (treating warrantless entry and seizure claims identically); Brokaw, 235 F.3d at 1022-23 (citing Fourth Amendment cases in determining whether procedural due process right was clearly established); Tenenbaum, 193 F.3d at 603-04 (describing the qualified immunity analysis for Fourth Amendment removal claim as “similar to our analysis of the individual defendants’ immunity from the procedural due-process claims”). To that extent, the majority “betrays a mind-set more useful to those who officiate at shuffleboard games, primarily concerned with which particular square the disc has landed on, than to those who are seeking to” ensure children’s safety. Florida v. Royer, 460 U.S. 491, 520, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (Rehnquist, J., dissenting).
Fortifying the case for qualified immunity, courts routinely make exceptions to constitutional doctrines when the welfare of a child is at stake. The Free Speech Clause forbids punishing a person for what he reads at home, see Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) — but not if he’s looking at child pornography, see Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). It prevents the government from regulating vulgar speech, see Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) — but not when the speech reaches children’s ears, see FCC v. Pacifica Found., 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). The Free Press Clause ensures that newspapers have access to criminal trials, see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) — but not when publicity would cause psychological harm to a child witness, see Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 608-09, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). The Second Amendment protects a right to carry guns, see District of Columbia v. Heller, 554 *708 U.S. 570, 128 S.Ct. 2788, 171 L.Ed.2d 687 (2008) — but not in school zones, see id. at 626, 128 S.Ct. 2788. The Confrontation Clause guarantees a defendant the right to meet adverse witnesses face-to-face, see Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895)-but not when that would traumatize a child witness, see Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Should we fault social workers for thinking that courts would also calibrate the protections of the Fourth Amendment to account for the protection of children?
All appellate law considered, the social workers acted reasonably from the vantage point of 2002. Even had they consulted a lawyer at every turn, consider the many questions implicated by this case. Do the normal Fourth Amendment standards apply? Is there a special needs exception for child endangerment eases? Does it make a difference whether the state officials are engaged in investigating criminal conduct or protecting children? Does past abuse suffice? Must the evidence of danger be within the past 24 hours? Or will evidence over the last month suffice? The majority may have some confidence in answering some of these questions today. But in the face of our previous silence, the Supreme Court’s continued silence and the conflicting signals sent by other circuits, I doubt even the most sophisticated social worker, accompanied by the most sophisticated attorney, could have distilled one framework for answering all of these questions in 2002. That is the purpose of qualified immunity, and that is why it applies here.
Third, qualified immunity protects state employees not just from after-the-fact second guessing when the law is unclear but also from after-the-fact second guessing when the facts are unclear. See Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir.2004) (asking “whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable”); Feathers v. Aey, 319 F.3d 843, 851 (6th Cir.2003) (“[Ajlthough the stop violated the Fourth Amendment ... the individual defendants had a sufficient factual basis for thinking that they were acting consistently with” the Constitution.). Even if the majority were correct to say that no exigency existed in 2002, that does not mean qualified immunity is unavailable. To the contrary, the record shows that at worst the social workers acted negligently, not as government workers who “knowingly violate[d] the law,” Malley, 475 U.S. at 341, 106 S.Ct. 1092, when they (and the state court) found an immediate risk of harm.
Consider the evidence of risk, keep in mind the risk of being wrong and recall that “[t]he ultimate burden of proof is on appellee to show that appellants are not entitled to qualified immunity.” Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir.1991). The police knew Nancy well. She had filed a fabricated police report, stolen a gun from Tom (the father), made dozens of phony phone calls about Tom to the police, and assaulted Tom’s sister, Colleen Nola, while the children (Danny and Katie) were watching. The social workers also knew Nancy well. Danny stabbed Nancy in the hand with a pen, allegedly in self-defense; reports suggested Nancy was providing inadequate clothing and medication for the children’s visits with Tom; Nancy slapped Katie, pulled her hair and pushed her into a door frame; according to Danny, Nancy hit him regularly, and at one point she threw Danny onto his bed and tackled him onto the floor; and Nancy told the kids they were to blame for the divorce and the loss of her job and that they might have to go to foster care and she might have to go to jail if they said anything to social workers.
*709 At the March 26 meeting between the social workers, the police, Tom, his father (Ed Kovacic) and Colleen, the police officers discussed these facts. R.48 (Kilbane Dep.) at 103; R.121-8 (Campbell Dep.) at 100-35; R.121-11; cf. Maj. Op. at 695 n. 1. They then summarized their interactions with Nancy and expressed concerns that Danny and Katie were unsafe in her care and that Nancy was capable of killing them. In the face of what they already knew about Nancy and with the officers reinforcing those concerns, Ponstingle, Csornok and Cameron agreed that Danny and Katie were in imminent danger and needed to be removed from their home. According to Cameron, they felt that it was an “urgent situation and something needed to be done now.” R.121-7 (Cameron Dep.) at 51. In light of these facts and given Nancy’s history, the social workers’ actions at worst look like the kind of “mistake” that qualified immunity excuses. Pearson, 555 U.S. at 231, 129 S.Ct. 808.
How, the majority suggests, could the social workers reasonably have thought an exigency existed if they waited to act until after the meeting and well after they already knew some of the allegations of abuse? But, so far as the record shows, the meeting was the first time many of the relevant actors were in the same room— and as a result the shared information could reasonably have had a crystallizing effect on the social workers. Intelligence agencies are not the only government entities that face the risk of siloing information. As one of the social workers explained in her deposition:
Q: We talked about the safety concerns based on the North Olmsted Police Department’s comments and the alleged escalating behavior. That was all information that came to you on the 26th, correct?
A: Correct.
Q: You had no inkling of any of that or hadn’t talked to any of the North ■Olmsted Police officers prior to that, correct?
A: Correct.
Ponstingle Dep. at 144-45; see also Cameron Dep. at 41 (“By the end of the meeting, I did feel more keenly that [the children] were at a greater level of risk than I was perceiving.”); id. at 67 (“I felt very strongly [after the meeting] that I had misinterpreted the seriousness of the [situation].”); Appellant Br. at 9 n. 4, 10 n. 6. Given this testimony and contrary to the majority’s view (Maj. Op. at 696 n. 2), the March 26 meeting gave the social workers a collective sense of risk that they did not individually appreciate before.
To say that social workers should have acted earlier, moreover, is not to say that they could not act later. But for DeShaney v. Winnebago Cnty. Dep’t of Social Servs., 489 U.S. 189, 196-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the social workers could be exposed to liability coming and going — for waiting too long to act in some settings and for acting too quickly in others. The point of qualified immunity is to give social workers room to operate reasonably between these extremes, not to expose them to liability whenever they err in one direction or the other.
Any doubt about this point ought to be confirmed by the actions of the juvenile court three days after the seizure. See Ohio Rev.Code § 2151.31(A)(3)(b) and (c). No one complains that this provision of Ohio law — this explanation for removing children from their family — violates the Fourth Amendment. Within three days of the seizure and after a hearing, the judge found the requisite probable cause and the requisite exigency. Cf. Messerschmidt v. Millender, — U.S.-, 132 S.Ct. 1235, 1250, 182 L.Ed.2d 47 (2012) (“The fact that the officers secured ... approvals [from a *710 magistrate and a prosecutor] is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause.”). And neither the children nor Ms. Kovacie challenged that decision. If ever there were a reason for granting qualified immunity, it would be this: The social workers faced an uncertain legal and factual landscape and decided to act; a state court judge found three days later that they acted properly; and the affected family members did not challenge the state court decision, thus permitting the children to live outside their mother’s care for the next ten months. Even if Heck does not apply in this setting, see Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and even if theré is not a general exhaustion requirement for constitutional torts, it is surely-material to the “clearly established” inquiry that the alleged victims of a child-endangerment investigation did not protest the seizure at the time.
It is true that the state court decision found that there is probable cause, not that there was probable cause, of the requisite exigency. But the children offer no evidence that anyone presented any new facts to the magistrate on the 29th that the social workers did not already know on the 26th. If removal on the 29th was in the children’s best interests, and if the magistrate on the 29th thought probable cause of an exigency existed, it is hard to say that the social workers acted unreasonably on the 26th. Indeed, so far as the record shows, keeping in iriind that the plaintiffs have the burden of production and persuasion, the state court relied on evidence that pre-dated even the March 26th meeting, suggesting that the social workers acted too slowly, not too precipitously, in taking the children into custody.' Even if that were not the case, it is unclear whether children living in' “a home environment [that] is adjudicated to have been abusive” have “a cognizable constitutional right not to be prematurely removed from the premises.” Southerland v. City of New York, 681 F.3d 122, 132 (2d Cir.2012) (Raggi, J., dissenting from denial of rehearing in banc). When a social worker has concerns that immediate removal is required and when a state court judge later vindicates those concerns after a hearing, it is a strange notion of qualified immunity that would permit the social workers to be found liable under § 1983. We should pause before making social workers retroactively liable for a three-day temporary seizure when the state court judge is insulated from liability for the ten months of custody that followed. No such oddity occurs if we respect the state court’s contemporaneous finding that probable cause of an exigency existed, which confirms that the social workers at most made a mistake.
In the end, these social workers faced two state laws allowing them to act, set against a murky backdrop of federal court precedent. And they had evidence of abuse, enough in fact to convince a magistrate that they acted correctly and that Nancy’s children ought not stay in Nancy’s care. Qualified immunity applies.
2. Qualified immunity from the Fourteenth Amendment due process claim. In addition to granting summary judgment for the children on their Fourth Amendment claim, the district court granted summary judgment on their due process claim under the Fourteenth Amendment. To my mind, the two doctrines run side by side. Under the Due Process Clause, a State must follow certain procedures before disrupting the parent-child relationship. Eidson v. Tenn. Dep’t of Children’s Servs., 510 F.3d 631, 635 (6th Cir.2007). While those procedures normally demand a pre-deprivation hearing, that is not true in the face of an immediate risk of harm to the children. Id.; see also Hooks v. *711 Hooks, 771 F.2d 985, 942 (6th Cir.1985). All of this takes me back to the same question asked and answered above: Under the state of the law in 2002, did the social workers act reasonably in seizing the children? For the reasons given above, I think they did.
3. The district court’s summary judgment ruling for the plaintiffs on the Fourth and Fourteenth Amendment claims. There is one other oddity about the majority’s decision. Before the district court were cross-motions for summary judgment, with the plaintiffs claiming they should win their Fourth and Fourteenth Amendment claims as a matter of law and the social workers claiming they should win those claims as a matter of law. The district court devoted all of its analysis to explaining why the plaintiffs should prevail as a matter of law on these claims and why the facts and law necessarily came out their way in piercing both prongs of the qualified immunity defense of the social workers — and in holding that all that remained was a damages trial on the plaintiffs’ two claims. When the social workers appealed that judgment, according to the majority, they brought before this court only the denial of their motion for summary judgment, not the grant of the plaintiffs’ motion for summary judgment on each claim. Put another way, the majority has written a decision that denies the social workers’ motion for summary judgment on the ground that, once all reasonable factual inferences are run in favor of the plaintiffs, their defense must go to a jury — pretending that the district court’s core holding that the plaintiffs win as a matter of law on both constitutional claims did not exist and somehow “reserving] judgment on those issues.” Maj. Op. at 697. Where to begin?
Parties appeal judgments, not" opinions — more precisely final judgments and reviewable interlocutory orders, not opinions. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In their notice of appeal, the social workers, government officials all, appealed the “Order entitled Memorandum Opinion and Order (Doc. 132).” R.135 at 1. That document included a number of orders, including most prominently the district court’s order that “Summary judgment is GRANTED in favor of plaintiffs and DENIED as to defendants on plaintiffs’ claims for unlawful seizure' ... and deprivation of their procedural due process rights to a notice and hearing ... as against defendants Ponstingle, Cameron, and Csornok.” R. 132 at 56. If an officer has a right to an interlocutory appeal challenging a district court’s decision to send certain claims to a jury in the face of a qualified immunity defense, she surely has a right to an interlocutory appeal challenging a district court’s decision that she loses those same claims as a matter of law. See, e.g., Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 549 (6th Cir.2002); Risbridger v. Connelly, 275 F.3d 565 (6th Cir.2002); Brennan v. Twp. of Northville, 78 F.3d 1152, 1157 (6th Cir. 1996); Mueller, 576 F.3d at 987-91 (9th Cir.2009); Sherbrooke v. City of Pelican Rapids, 513 F.3d 809, 813 (8th Cir.2008); Anderson v. Recore, 446 F.3d 324, 328 (2d Cir.2006); Jackson v. Sauls, 206 F.3d 1156, 1164 (11th Cir.2000); Hodge v. Jones, 31 F.3d 157, 168 (4th Cir.1994). The majority opinion offers no contrary authority. There is none.
Having appealed the relevant order, the social workers proceeded in their appellate briefs to attack all of the legal analysis pertinent to the district court’s decision to grant victory to the plaintiffs as a matter of law. See, e.g., Br. at 7-10,12-13, 20-22, 25-27; Reply Br. at 2-7. That was not hard. All of the district court’s orders contain just one legal analysis relevant to *712 this point, and it arises in the context of the court’s decision to grant summary judgment for the plaintiffs. Of course, in other words, the social workers challenged the district court’s legal reasoning relevant to the grant of summary judgment to the plaintiffs and denial of it to the social workers — because that was all there was. On this record, it is not plausible to say that the social workers somehow appealed only the denial of their motion for summary judgment and forfeited their right to challenge the district court’s grant of summary judgment to the plaintiffs. That did not happen in the notice of appeal, and it did not happen in the appellate briefing.
Nor do the plaintiffs think otherwise. They did not argue in their appellate brief that the social workers forfeited their right to challenge the summary judgment ruling for the plaintiffs. If the social workers forfeited a challenge to the ruling in favor of the plaintiffs, in other words, the plaintiffs forfeited the forfeiture. United States v. Turner, 602 F.3d 778, 788 (6th Cir.2010). But the plaintiffs should not feel bad. There is a good reason they did not argue that the social workers forfeited any challenge to the summary judgment ruling for them. It would not make sense — and not just because the notice of appeal and appellate briefs preserved the argument. If true, it would mean the social workers forfeited the entire appeal. For if the district court’s matter-of-law ruling for the plaintiffs stands (because forfeited), it is not possible to rule for the defendants as a matter of law or even to let them have their day in court in front of a jury. Both potential rulings cannot coexist with the (purportedly) unchallenged ruling that plaintiffs win as a matter of law. This unusual turn of events deserves an explanation. The majority does not give one.
That leaves one more nail. The majority is mistaken even on its own terms. The apparent premise of the majority’s opinion is that the social workers appealed only the order denying their motion for summary judgment, not the order granting summary judgment to the plaintiffs. But if that were true — it is not — an appeal brings with it the analytical basis for that ruling. There is just one analytical premise for that ruling — the district court’s 24 pages of analysis explaining why the plaintiffs win as a matter of law on those same two constitutional claims. If the majority is unwilling to let the social workers explain why those 24 pages of analysis are wrong, there is little, if anything, to argue — and no point to this appeal. The sole analytical premise for the denial of the social workers’ motion for summary judgment was that “[n]o reasonable juror could find that Ms. Kovacic posed an imminent threat of physical harm to her children.” R.132 at 21. How can the social workers challenge the denial of their motion for summary judgment — the ruling the majority concedes is before us — without challenging that reasoning? And how can they win that part of their appeal without defeating that analysis? Not losing is a necessary first step to winning. The same is true for the prong two — clearly established — inquiry. Id. at 46. Since it “already held that defendants’ actions violated plaintiffs’ constitutional rights ... the only remaining inquiry [was] whether those rights were clearly established.” Id. at 46. District court’s answer: yes. Id. at 49. Social workers’ appeal: no. All of this is, and must be, before us.
Nor can the majority escape this bind by invoking pendent appellate jurisdiction, claiming that the plaintiffs’ victory as a matter of law is only before us through this doctrine and claiming that we have discretion — a choice — to consider the merits of this ruling. Maj. Op. at 696-98. That doctrine has nothing to do with this case, and no party argues otherwise. *713 There might be a debate about pendent appellate jurisdiction, for example, if the social workers had lost some state law defenses (or other separate defenses arising from the same incident) and if they had sought interlocutory review of them along with review of an order denying relief on federal defenses. But this was an appeal by the social workers with respect to losses on their federal defenses and federal defenses alone. The Mount Everest of appealable orders is a challenge to a district court’s order that government employees lose a federal § 1983 claim as a matter of law — the very ruling the majority opts not to review. Pendent , appellate jurisdiction simply is not at issue, and we have no discretion to avoid ruling on the be-all-and-end-all of the social workers’ appeal: They cannot possibly win as a matter of law if they lose as a matter of law.
The only two cases in our circuit arising in a similar posture, Farm Labor and Brennan, do not help the majority, for they exercise jurisdiction over a matter-of-law ruling against the defendants. 308 F.3d at 551, 78 F.3d at 1158. Those cases obviously do not hold that we have discretion not to exercise jurisdiction over such a ruling, whether under the name of pendent appellate jurisdiction or some other doctrine. Not only do the cases not establish relevant holdings on point, but the dicta in them misapprehends the concept of pendent appellate jurisdiction. As its name implies, pendent appellate jurisdiction brings in related claims that are nonetheless different from the matter that is already before the court. It makes no sense to apply that doctrine to the same claim— here, the Fourth and' Fourteenth Amendment claims raised by the plaintiffs and defendants on qualified immunity grounds.
The majority’s opinion leaves open the possibility (I think) that, after the damages trial on the plaintiffs’ Fourth and Fourteenth Amendment claims, our court could still determine that the plaintiffs should not have won as a matter of law and then determine that a trial must be held after all — more than a dozen years after the underlying incident and many more years after useful memories of it have faded. That would be a first in my experience with interlocutory qualified immunity appeals — and hardly a model of fair and efficient court administration. By being whisper quiet about all of these things, moreover, the majority permits the inferences from the deposition testimony to run in favor of the plaintiffs today. Of course, if we reviewed the appealed, argued and core question raised on appeal— did the trial court properly grant judgment as a matter of law to the plaintiffs?— the inferences all would run in favor of the social workers.
I respectfully dissent.