NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0681n.06

Case Nos. 14-2595/15-2326

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | **FILED** |
| ANGIE HALL; MATTHEW HALL, | ) | Dec 16, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| KATRICE SWEET; KATHLEEN SINNAMON; | ) | DISTRICT OF MICHIGAN |
| JIM GALE; MAURA D. CORRIGAN, in their | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants-Appellants. | | **O P I N I O N** |

BEFORE: KEITH, McKEAGUE, and WHITE, Circuit Judges.

McKEAGUE, Circuit Judge. This case arises out of investigations of a group child care home. On two separate occasions, once in 2010 and once in 2011, employees of Michigan's Department of Health and Human Services, Katrice Sweet and Kathleen Sinnamon, responded to complaints that Angie Hall's group child care home was in violation of her license. On both occasions, one or both employees searched the Halls' home looking for children Ms. Hall may have hidden from inspectors. During the 2010 search, children were found hidden in a private room behind a locked door. Ms. Hall's license was subsequently revoked.

The Halls brought suit under 42 U.S.C. § 1983, in part claiming that the searches of their home violated the Fourth Amendment. The district court denied defendants' motion to dismiss based on qualified immunity on the claim, holding that the complaint adequately alleged a

colorable claim in avoidance of qualified immunity. However, Ms. Hall consented to searches of this nature in her 2008 license renewal application, and such consent undercuts the Fourth Amendment claim. Moreover, plaintiffs failed to allege conduct that violated their rights under clearly established law at the time of the investigations. Therefore, we reverse the district court's order denying defendants Sweet and Sinnamon qualified immunity.

**I**

Beginning in 2006, Angie Hall operated a licensed "group child care home" in Middleville, Michigan in the house she owned with her husband. The Halls' living space was on the upper level and approved child care space was on the lower level. The entrance to the living area on the first floor was also the entrance to the day care space on the lower level. The group child care home was subject to many rules under Michigan's child care licensing regulations, including a maximum capacity of twelve children and a maximum child-to-caregiver ratio of 6 to 1. *See* Mich. Admin. Code, R. 400.1908, R. 4001.1910.

In 2008, Ms. Hall applied for renewal of her license. As part of the one-page renewal application, Ms. Hall checked a box agreeing to an inspection of her facility. She signed the application and her license was renewed without restrictions or limitations.

In 2010, authorities received an anonymous complaint that Ms. Hall's group child care home was over-capacity and that she was hiding children during inspections.[1] In response, Katrice Sweet, a licensing consultant with the State of Michigan's Department of Health and Human Services (DHHS) Bureau of Children and Adult Licensing, conducted an unannounced on-site inspection of the child care home.

---

[1] Hall had previously been found to be both over-capacity and over-ratio. Hall signed a Corrective Action Plan in 2007 admitting to being over-capacity and over-ratio and agreeing to future compliance.

On the day of the inspection, Sweet entered the house without knocking and without a warrant. She went directly to the lower level where Ms. Hall was supervising children with an assistant. Sweet demanded that Ms. Hall show her the entire home. Together with Ms. Hall, Sweet looked throughout the home for hidden children, including in bedrooms, closets, and cabinets on the upper level. Eventually, she found four children hiding behind a locked door in the lower level in space used by the Halls as a workout room not approved for child care. With those four children counted, the child care home was supervising fifteen children, and was thus over-capacity and over-ratio. Sweet's subsequent report led to an administrative hearing and contributed to the eventual revocation of Hall's license.

The 2011 inspection took place while the administrative process was playing itself out. Following a complaint that the group child care home was operating without an assistant caregiver, Sweet, along with her supervisor Kathleen Sinnamon, returned to the house to investigate, without a warrant. Sweet again searched the entirety of the home. Unlike the 2010 investigation, however, the 2011 investigation uncovered no violations. *Id.* In January of 2012, a Michigan appeals court affirmed the Administrative Law Judge's decision to revoke Hall's license.

Following the revocation of Ms. Hall's license, Angie and Matthew Hall filed a complaint, under 42 U.S.C. § 1983 in the United States District Court for the Western District of Michigan, alleging that DHHS employees had committed various constitutional violations during the two investigations and the administrative proceedings against Angie Hall. Plaintiffs'

complaint named DHHS Bureau of Children and Adult Licensing directors Maura Corrigan and Ismael Ahmed,[2] bureau director Jim Gale, Sweet, and Sinnamon as defendants.

In place of an answer, the defendants filed a motion to dismiss that raised several grounds for dismissal, including a qualified immunity defense. R. 57, Dist. Ct. Op. PID 1234. Following subsequent briefing, the district court issued its order granting the defendants' motion on all counts against all defendants except one: the claim that Sweet and Sinnamon's warrantless searches of the Halls' residence during the 2010 and 2011 investigations violated the Fourth Amendment.[3] *Id.* at 1238, 1274.

In the district court, defendants argued that the 2010 and 2011 investigations fell within an exception to the Fourth Amendment warrant requirement. *Id.* at 1259–60. The district court disagreed. *Id.* at 1262. The court held that a warrantless search of a home is presumptively unreasonable, that the warrant requirement was clearly established law, and that the pleadings did not support defendants' position that a warrant exception applied here. *Id.* at 1259.

The district court rejected all three theories asserted by defendants that would have made out exceptions to the warrant requirement. *Id.* Defendants first argued that consent for the searches flowed from the license renewal application signed by Ms. Hall on which she checked a box agreeing to a reasonable onsite inspection of her group child care home. *Id.* The district court did not consider this application—it considered the document to be outside the pleadings—

---

[2] Plaintiffs stipulated to the dismissal of Defendant Ismael Ahmed. R. 57, Dist. Ct. Op. PID 1230, n.1.

[3] The district court dismissed the claims against Corrigan and Gale relating to the two investigations because plaintiffs failed to state a claim against them in their individual capacities. R. 57, Dist. Ct. Op. PID 1249–50, 1271, n.6. On appeal, defendants again raise a defense for Corrigan and Gale. Plaintiffs do not respond to this defense. However, reading the district court opinion as having dismissed the claims against Corrigan and Gale and the plaintiffs as having waived any objection to that dismissal, the issue of Gale and Corrigan's liability is not before this court. All that remain are the claims against defendants Sweet and Sinnamon for the searches of plaintiffs' home.

and so concluded that the consent exception did not apply. *Id.* at 1259–60. The court also rejected defendants' argument that Michigan statutes and regulations gave them authority for the searches. *Id.* at 1260. The court held that the regulations defendants cited were inapplicable because "[t]o the extent that on-site inspections are authorized, they are authorized for situations and circumstances other than what occurred here." *Id.* Finally, the court found defendants' argument that the closely-regulated business exception applies to group child care homes was unpersuasive and unsupported by authority. *Id.* at 1261.

Defendants, Sweet and Sinnamon, now appeal the district court's denial of their motion to dismiss based on qualified immunity.[4]

## II

The district court had federal question subject-matter jurisdiction over plaintiffs' claims for violations of the Fourth and Fourteenth Amendments of the U.S. Constitution, actionable under the provisions of 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331. Defendants' appeal challenges an interlocutory ruling that would not ordinarily be subject to immediate review. However, a pretrial order denying qualified immunity is immediately appealable under the collateral order doctrine insofar as it implicates only questions of law. *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2018–19 (2014); *McDonald v. Flake*, 814 F.3d 804, 812–13 (6th Cir. 2016).

This appeal boils down to three pure issues of law. First, defendants challenge the district court's determination that the 2008 license renewal application is not part of the pleadings for purposes of the motion to dismiss. Second, when considering whether there was a

---

[4] This is a consolidated appeal. Defendants first filed an interlocutory appeal of the district court's initial denial of qualified immunity for the Fourth Amendment claim, which this court held in abeyance until the district court issued an order fully resolving the motion to dismiss. The district court's subsequent order again denied qualified immunity for the Fourth Amendment claim, which was also appealed, and which this court consolidated with the first appeal.

constitutional violation, defendants appeal implicates the scope of consent provided by that renewal application, on which Ms. Hall marked that she agreed to an investigation by DHHS officials. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (scope of consent is a question of objective reasonableness). Third, if necessary, this court considers whether the alleged wrongful conduct by defendants violated clearly established rights at the time of the searches. *See Johnson v. Jones*, 515 U.S. 304, 313 (1997) (there is appellate jurisdiction for "[t]he purely legal issue of what law was 'clearly established'") (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985)).

Because these three issues raise only pure questions of law, we have appellate jurisdiction under the collateral order doctrine to consider the district court's denial of qualified immunity. *See Plumhoff*, 134 S.Ct. at 2018–19 (deciding a qualified immunity defense as to whether conduct violated the Fourth Amendment or violated clearly established law is "a core responsibility of appellate courts").

**A**

A district court's denial of a motion to dismiss that raises a qualified immunity defense is reviewed de novo. *Johnson v. Moseley*, 790 F.3d 649, 652 (6th Cir. 2015). The court accepts the complaint's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The threshold issue is whether the district court evaluated the motion to dismiss based on a too-restrictive view of the pleadings. As part of her 2008 license renewal application, Ms. Hall checked a box next to the following consent provision:

> [i]n order to permit proper determination of conformity with the rules, I give permission to the Michigan Department of Human Services to make a necessary and reasonable investigation of activities and standards of care, and to make an onsite inspection of my facility and services.

Brief for Defendants-Appellants, Exhibit 1, PID 81. The district court refused to consider the license renewal application because it was "outside the pleadings" and not "central to the complaint." R. 57, Dist. Ct. Op. PID 1259–60. Defendants assert the district court should have considered the application.

As this court has held, when a court "is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletics Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Here, the 2008 renewal application's consent provision was referred to in and central to the complaint, attached as an exhibit to defendants' motion to dismiss, and fully quoted in exhibits attached to the complaint. The 2008 renewal was Ms. Hall's final renewal before her license was revoked and covered the time period at issue here. Plaintiffs refer to renewal of her license in 2008 throughout their complaint, including, in paragraph 75 of the complaint, a direct reference to the consent provision taken from the transcript of the administrative hearing. This specific reference to the application was central to plaintiffs' claims that DHHS had an

unconstitutional policy permitting searches of a group child care home in its entirety.[5]  In support of these claims, plaintiffs attached exhibits to their amended complaint, records from Ms. Hall's administrative hearing, directly quoting the application and confirming that Ms. Hall signed it. Moreover, defendants attached a signed copy of the signed 2008 renewal application as an exhibit to their motion to dismiss.

Taking all of this together, and as conceded by plaintiffs' counsel at oral argument, the court can and should consider the 2008 renewal application and its language when evaluating de novo the denial of the Rule 12(b)(6) motion to dismiss.  *See Bassett*, 528 F.3d at 430; *see also MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 657–58 (6th Cir. 2013) (deriving facts, on a motion to dismiss, from five exhibits attached to the complaint); *Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (considering copies of contracts attached to defendant's motion to dismiss that were referenced in and central to plaintiff's complaint).  Thus, the district was permitted to consider the 2008 renewal application when considering this motion and we may consider it now.

**B**

**1. Qualified Immunity Framework**

Government officials may raise qualified immunity as a defense to a § 1983 action.  Once raised, the plaintiff bears the ultimate burden of demonstrating that the defendant is not entitled to qualified immunity.  *Rodriguez v. Passinault,* 637 F.3d 675, 689 (6th Cir. 2011).  We follow a two-part inquiry to determine when a grant of qualified immunity is proper.  *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).  To survive a qualified immunity defense, the facts as alleged must show that the

---

[5] These claims were dismissed by the district court and are not revived here.  *See* R. 57, Dist. Ct. Op. PID 1247–50.

defendant violated a constitutional right and that the right at issue was "clearly established" at the time of the event. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If either requirement is unmet, qualified immunity shields the official from civil damages. *Austin,* 690 F.3d at 496 (citing *Pearson,* 555 U.S. at 236). The court may make the two necessary determinations in either order, but need not reach both. *Id.*

**2. Whether a Constitutional Right was Violated**

We begin with the first step in the qualified immunity analysis: whether, as pleaded, the 2010 and 2011 investigations violated plaintiffs' Fourth Amendment rights. The Fourth Amendment protects against unreasonable searches and seizures. The Supreme Court has recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Thus, a warrantless search inside a home by a government official violates the Fourth Amendment unless an exception to the warrant requirement applies. *See Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 854, 858 (6th Cir. 2012).

The parties do not dispute that both the 2010 and 2011 investigations of the Halls' home were conducted without a warrant. Therefore, defendants must demonstrate that an exception to the warrant requirement applied to each search in order to prevail on this prong of their qualified immunity defense.

Defendants assert that Ms. Hall consented to the searches of her entire home, which, if true, would be enough to show there was no constitutional violation. It is well settled that "a

person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

To support their position, defendants rely on Ms. Hall's 2008 license renewal application on which she agreed that:

> [i]n order to permit proper determination of conformity with the rules, I give permission to the Michigan Department of Human Services to make a necessary and reasonable investigation of activities and standards of care, and to make an onsite inspection of my facility and services.

Brief for Defendants-Appellants, Exhibit 1, PID 81. Defendants argue that this signed permission gave consent for the full scope of the 2010 and 2011 searches—including the search of portions of plaintiffs' home that were not approved for child care. Plaintiffs do not dispute that Ms. Hall signed the application and checked the box giving consent to search or, as conceded at oral argument, that it gave consent for searches of approved child care space. Their challenge implicates the scope of consent, not the fact of consent.[6]

The scope of a warrantless search is limited by the scope of consent. *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997). The scope of consent is determined by objective reasonableness. *See United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991)). "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 252 (citing *United States v. Ross*, 456 U.S. 758 (1982)). Thus, a search is not beyond the scope of consent when it was reasonable given its expressed object. *See id.* (finding consent to search a car for drugs included consent to search a

---

[6] In paragraph 78 of their amended complaint, plaintiffs allege, with regard to the 2011 search, that neither plaintiff "gave consent for this search" but instead "complied to this search because under the licensing rules and regulations, failure to cooperate with the licensing consultant during an investigation is a violation." This allegation speaks only to the occasion of the search—not the 2008 renewal application's consent provision—and is rendered immaterial if that consent provision provided consent for the search. We do not require both written and oral consent for it to be effective. *Cf. United States v. Frost*, 521 F. App'x 484, 489 (6th Cir. 2013) (oral consent to search was not rendered equivocal by refusal to sign written consent form).

paper bag in the trunk); *see also Garrido-Santana*, 360 F.3d at 576 (search of a gas tank fell within scope of suspect's consent when he knew officers were searching his car for drugs).

Reading the consent provision on Ms. Hall's license renewal application in light of the relevant regulatory scheme reveals that she agreed to a search of her entire home. The renewal application provided consent for an inspection of Ms. Hall's "facility" for the purpose of ensuring "conformity with the rules." Although neither "facility" nor "rules" was expressly defined on the form, reading the language in context shows it was objectively reasonable to understand the language as providing consent for the full scope of the challenged searches. As conceded at oral argument, the "rules" were Michigan's child care regulations and the application was signed to renew Ms. Hall's license to operate the "group child care home" she ran out of her home. From this, it follows that the "facility" referenced on the form was the "group child care home" for which she was renewing her license. Notably, the "rules" included Michigan's Child Care Licensing Act, which defined "group child care home" as a private residence:

> (i) "Private home" means a *private residence* in which the licensee or registrant permanently resides as a member of the household, which residency is not contingent upon caring for children or employment by a licensed or approved child placing agency. Private home includes a full-time foster family home, a full-time foster family group home, a *group child care home*, or a family child care home, as follows:
>
> …
>
> (*iv*) "Group child care home" means *a private home* in which more than 6 but not more than 12 minor children are given care and supervision for periods of less than 24 hours a day unattended by a parent or legal guardian, except children related to an adult member of the family by blood, marriage, or adoption. Group child care home includes a home in which care is given to an unrelated minor child for more than 4 weeks during a calendar year.

Mich. Comp. Laws § 722.111(1)(i)(*iv*) (emphasis added). Thus, Ms. Hall's consent to inspections of her group child care "facility" reasonably provided consent to inspections of her

entire residence. The two are one and the same. And plaintiffs make no claim that they withdrew or limited the scope of this consent before or during either search.

Nor did the two searches wander beyond their express object: to ensure conformity with the ratio and capacity rules governed by Mich. Admin. Code R. 400.1908. The searches followed reports that Ms. Hall was violating these rules and hiding children in space not approved for child care during inspections, and were limited to spaces where children might actually be hidden. Thus, the searches fell fully within the scope of consent provided by the 2008 license renewal application signed by Ms. Hall.

Finally, it cannot be said that the consent provision was invalid simply because agreeing to its terms may have been a condition of receiving the child care operating license. We recognize that "conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable." *Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000) (collecting cases); *see also Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 366–67, 384 (6th Cir. 1998) (finding no constitutional violation for requirement that school employees agree to suspicionless urinalysis as a condition of job offer). Here, Ms. Hall was operating a child care business out of a home under a license that, upon renewal, asked her to agree to inspections intended to ensure her home complied with child safety requirements.

If this consent provision is read as a condition of the license, it is a reasonable one. For one thing, the state has an overwhelming justification in ensuring child wellbeing is adequately protected at the locations it licenses for child care. For another, homeowners voluntarily operating a child care business out of their home—knowingly subjecting that home to related

regulatory oversight—have a reduced expectation of privacy there. Under these circumstances, and weighing the state's interest in protecting child safety against the privacy interest of child care licensees, it is reasonable for these licenses to be conditioned on consent to investigations of the houses where the child care homes are operated. *Cf. Knox Cty. Educ. Ass'n,* 158 F.3d at 379, 384 (drug testing of school employees was reasonable given the public's "very strong" interest in ensuring child safety through testing and because the employees' privacy interest was "significantly diminished by the level of regulation of their jobs and by the nature of the work itself"). Conditioning a group child care home license on consent to search that home is distinguishable from unreasonably conditioning a license on consent to search areas unrelated to that license and with no similarly compelling childcare interests at stake. *See, e.g.*, *Anobile v. Pelligrino*, 303 F3d 107, 121, 124–25 (2d. Cir. 2001) (state horse racing license was impermissibly conditioned on consent to search dormitories). In sum, the condition here, that the group child care home license would issue only if the state could inspect the home for regulatory compliance, was a reasonable one. The consent to search was therefore effective.

Accordingly, the court finds defendants' conduct was not a violation of the Fourth Amendment because Ms. Hall had consented to the searches and plaintiffs did not withdraw or otherwise limit that consent.

### 3. Whether the Right was Clearly Established

However, even if we were to assume, *arguendo*, that the pleadings are sufficient to show a constitutional violation; defendants remain entitled to qualified immunity unless plaintiffs have also shown that defendants' conduct violated a clearly established statutory or constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs fail to do so.

A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "Qualified immunity ordinarily applies unless the contours of the asserted right were sufficiently clear that every reasonable official would have understood that what he was doing violated that right." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). Accordingly, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted). Thus, qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

The burden of showing that a right was clearly established at the time of an alleged injury falls to the plaintiff. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). To determine "whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, to ask whether these precedents 'placed the ... constitutional question beyond debate.'" *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Andrews*, 700 F.3d at 853.

Here, we consider the decision by DHHS licensing consultants, responsible for ensuring child care homes are compliant with child safety rules, to conduct warrantless searches of plaintiffs' home following reports that Ms. Hall's group child care home was over-ratio, over-capacity, and that she was hiding children during inspections and knowing she had given consent to a reasonable search of her facility. Plaintiffs have failed to show this discretionary conduct violated a clearly established right.

Plaintiffs cite to *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523 (1967) to show that it has long been established that "administrative" searches require a warrant. In *Camara*, the Court concluded that "administrative searches," conducted there to ensure compliance with the city's housing code, were "significant intrusions upon the interests protected by the Fourth Amendment." 387 U.S. at 534. Thus, the Court held that the Fourth Amendment warrant requirement applied to "administrative searches" of private residences. *Id.* Plaintiffs point to several other cases derived from *Camara*'s holding that show other "administrative searches" found to violate the Fourth Amendment. *See Michigan v. Tyler*, 436 U.S. 499 (1978) (entry of a burned building by firefighters and detectives to look for the fire's cause required a warrant); *Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978) (provisions under OSHA permitting warrantless searches of a business to ensure compliance with workplace safety rules were unconstitutional).

Plaintiffs' rely on these cases for the proposition that a government search of a home to check for compliance with a regulatory code—no matter who searches or what the regulatory code covers—is an "administrative search" that must comport with the Fourth Amendment warrant requirement and that this is clearly established. In other words, plaintiffs argue that, because the searches here were to ensure plaintiffs' compliance with (child care) regulations, they were "administrative" searches and therefore violated clearly established Fourth Amendment rights because they lacked a warrant.

This position is untenable. Qualified immunity requires plaintiffs "to plead facts making out a violation of a constitutional right clearly established in a particularized sense. That is, the right said to have been violated must be defined in light of the specific context of the case, not as a broad general proposition." *Johnson v. Moseley*, 790 F.3d at 654 (quoting *Brosseau v. Haugen*,

543 U.S. 194, 198 (2004)). Plaintiffs draw the right here in a much too generalized way and ignore the specific context of the case. *Camara* and its progeny provide only a broad generalization on which officials in defendants' shoes could rely to discern whether their conduct was unlawful: that the searches were related to suspected regulatory violations. Showing conduct violates a clearly established right requires more particularized context than plaintiffs provide through their cited cases. *See id.* Indeed, this was the district court's error as well.

Most importantly, plaintiffs fail to consider the essential contextualizing fact that Ms. Hall agreed to an onsite inspection of her facility and services in her licensing renewal. Even assuming, *arguendo*, that this consent provision did not provide *actual* consent for the full scope of the searches, it cannot be said it was objectively unreasonable for the DHHS employees to *believe* it did. While the form did not explicitly define "facility" anywhere, the relevant regulations defined private home and group child care home as one and the same *and* regulated space not approved for child care,[7] making it reasonable for the DHHS employees to believe Hall had given consent for a search of the entire home by agreeing to a search of her "facility" in order "to ensure conformity with the rules." Indeed, defendant Sweet indicated that this was her understanding of the provision when, during the administrative proceedings against Ms. Hall, she said that "I believe . . . it states on the [license] application that they will give us access to their whole entire home." R. 43, Amd. Complt., PID 629. In light of the relevant regulations and the provision's language, a belief that the form gave consent for the full scope of both searches is a reasonable one.

---

[7] *See, e.g.*, Mich. Admin. Code R. 400.1944 (requiring smoke detectors installed and maintained "on each floor of the home"); Mich. Admin. Code R. 400.1935 (regulating the storage and sale of firearms on the premises).

In short, because of the consent provision from the license renewal application, it cannot be said that defendants Sweet and Sinnamon were plainly incompetent or in knowing violation of the law when they searched space in the home not approved for child care. Theirs was precisely the kind of reasonable discretionary conduct—even if based on a mistaken understanding of fact or law—that the doctrine of qualified immunity protects. *See, e.g.*, *Pearson*, 555 U.S. at 231.

Plaintiffs' argument that the law was clearly established is further undermined by the close resemblance of the investigations here to that at issue in *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 854, 858 (6th Cir. 2012). *Andrews* involved the warrantless search of a house in 2008, conducted by social workers investigating allegations of child abuse. *Id.* at 850. In response to a complaint, the social workers entered the home and conducted a walk-through, checking for food and ensuring any weapons were properly stored. *Id.* at 850–51. They did not find any violations. *Id.* at 851. The court, considering a qualified immunity defense, held the entry and search violated the Fourth Amendment, but went on to consider whether it was clearly established at the time whether the Fourth Amendment warrant requirement applied to "social workers carrying out investigations regarding the welfare of children." *Id.* at 860. The court held it was not. *Id.* Since then, this circuit has continued to hold that it was not clearly established that the warrant requirement applied to social workers conducting similar investigations prior to the *Andrews* decision, at least through 2011. *See Brent v. Wenk* , 555 F. App'x 519 (6th Cir. 2014) (holding a social worker's 2010 investigation relating to child wellbeing did not violate clearly established law); *Barber v. Miller*, 809 F.3d 840 (6th Cir. 2015)

(a social worker's 2011 investigation relating to child wellbeing did not violate clearly established law).[8]

In light of both *Andrews* and *Camara*, it cannot be said that defendants violated clearly established law. At the time of the challenged searches, either one of these competing Fourth Amendment case lines potentially applied—defendants' conduct arguably resembled that of the social workers granted qualified immunity in *Andrews* as much as that of the administrative searchers in *Camara*. And no decision of this court or the Supreme Court had addressed, even generally, whether a warrant was required for the search of a home out of which a state-regulated day care was operated. Given this lack of certainty in Fourth Amendment's applicability to the circumstances faced by defendants, reasonable officials in their shoes would not have been on clear notice whether their conduct violated the law.

Plaintiffs attempt to undermine any similarity of the facts here to those in *Andrews* by citing to a 2004 opinion from the Western District of Michigan which had held, prior to *Andrews*, that social workers conducting a warrantless search of a home violated the Fourth Amendment. *O'Donnel v. Brown*, 335 F. Supp. 2d 787, 827 (W.D. Mich. 2004) (noting that "government officers [including social workers] cannot enter a home without either prior court approval, consent, or exigent circumstances"). Plaintiffs point out that this opinion was from the same district court where the instant case was filed and therefore it should have put the

---

[8] Another case of this circuit also dealt with an alleged Fourth Amendment violation by social workers investigating child welfare. *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687 (6th Cir. 2013). *Kovacic* considered the 2002 *removal* of children from a home by social workers without a warrant. *Id.* at 692. The court found that *seizures* of children by social workers, if not searches related to them, violated clearly established Fourth Amendment rights. *Id.* Sweet and Sinnamon did not remove any children, so this case is irrelevant here.

defendants on notice that their conduct was unlawful to the extent it resembled child welfare investigations by social workers.

Plaintiffs find support for their position—that the district court decision is enough on its own to clearly establish law in that district—in a footnote from the *Andrews* opinion. In finding there was no precedent in either the Supreme Court or the Sixth Circuit clearly establishing whether social workers were required to comport with the Fourth Amendment, the *Andrews* court used a footnote to dispose of a lower court decision to the contrary. *Andrews*, 700 F.3d at 862, n.7. That decision came out of the United States District Court for the Northern District of Ohio and held not only that social workers were constrained by the Fourth Amendment, but that this right was clearly established. *Id.* (citing *Walsh v. Erie Cnty. Dep't of Job & Family Serv.*, 240 F.Supp. 2d 731 (N.D. Ohio 2003)). However, the *Andrews* court said this lower court opinion was not enough for the purposes of the case before it because "[t]he instant case was heard in the Middle District of Tennessee" and therefore the *Walsh* decision, out of the Northern District of Ohio, was "not sufficient to put the State Defendants on notice that the right was clearly established." *Andrews*, 700 F.3d at 862, n.7. In the same footnote, the *Andrews* court seemed to imply that—had the earlier district court been the same one out of which the instant appeal arose—it might have been enough to put the defendants on notice. *Id.* ("to find a clearly established right, absent extraordinary circumstances, a district court looks to 'binding precedent by the Supreme Court, its court of appeals *or itself*'") (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1989) (emphasis added).

Plaintiffs read this footnote too broadly. A single district court opinion is not enough to pronounce a right is clearly established for purposes of qualified immunity. While a district

court opinion may be *persuasive* in showing there is a clearly established right—perhaps by exposing a trend in non-precedential case law—it is not *controlling* on its own.[9]

Further, even were we to consider *O'Donnel,* the proposition for which plaintiffs cite the case was extinguished by this circuit's directly contrary holding in *Andrews*. It cannot be said *O'Donnel* placed a constitutional question "beyond debate" when later, in *Andrews*, this circuit found the very same question did not have a clear answer. In short, decisions from this court stand for the proposition that, between 2008 and 2011, it was not clearly established in any district of this circuit that the Fourth Amendment applied to social workers conducting a search of a home relating to the wellbeing of children. *See Barber, 809* F.3d at 846–47. This uncertainty in whether the Fourth Amendment applies to investigations related to child wellbeing contributes to a finding that defendants were not on clear notice whether their conduct violated the law.

---

[9] The same is true in other circuits. *See, e.g.*, *Estate of Escobedo v. Bender,* 600 F.3d 770, 781 (7th Cir. 2010) ("to determine whether a right is clearly established at the time of the violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit. In the absence of controlling precedent, we must broaden our survey to include all relevant case law in order to determine whether there was *such a clear trend in the caselaw* that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time") (internal quotations omitted) (emphasis added); *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) ("for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains") (internal quotations omitted). Indeed, in several circuits, district court opinions are not considered whatsoever in determining clearly established law. *Moore v. Pederson*, 806 F.3d 1036, 1047 (11th Cir. 2015) ("to determine qualified immunity, an Eleventh Circuit court looks to decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state") (internal quotations omitted); *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006) ("When neither the Supreme Court nor this court has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit"); *but see Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) ("[i]n the absence of binding precedent clearly establishing the constitutional right, we look to whatever decisional law is available including decisions of state courts, other circuits, and district courts") (internal quotations removed).

In sum, considering the circumstances of the two searches as pleaded in light of then-established law, it was not clearly established that Sweet and Sinnamon were violating the Fourth Amendment when they searched plaintiffs' home without a warrant in 2010 and 2011. A reasonable investigator "faced with the circumstances of this case could not ascertain from clearly established law the legality of her conduct." *Andrews*, 700 F.3d at 862. Plaintiffs have therefore failed in their burden to establish in the pleadings that defendants violated a clearly established right. Accordingly, defendants are entitled to qualified immunity.

## VI

For the reasons above, we **REVERSE** the district court's order denying Sweet and Sinnamon's motion to dismiss based on the qualified immunity defense.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I agree with the majority's decision to reverse the district court's order denying Sweet and Sinnamon's motion to dismiss with regard to the first search. Sweet and Sinnamon were entitled to qualified immunity for this search because it was objectively reasonable for Sweet to construe Hall's consent as encompassing the first challenged search. As to the second search, I disagree with the majority's conclusions that the search was reasonable and that the law was not clearly established at the time of the searches.

The majority correctly observes that Michigan has a strong interest in ensuring child safety in child care facilities, and I agree that the first search—conducted pursuant to a report that Hall was hiding children in rooms unlicensed for child care—was permissible. It was objectively reasonable for Sweet to believe that Hall's consent to an "onsite inspection of [her] facility" to determine "conformity with the rules" authorized the search for hidden children.

I disagree with the majority, however, insofar as it implies that the second search was authorized under the license renewal application's consent provision because of Hall's past violation of Michigan's child care rules. Assuming arguendo that the majority correctly interprets the consent provision to apply by its terms to the entire house, the second search fails to meet the provision's own reasonable and necessary standard. Under the majority's reading of the provision, Hall's February 18, 2010, violation justified a warrantless, on-demand search of the entirety of Hall's private residence *over a year later*, on May 24, 2011—even though there was no allegation that Hall was hiding children at this time. The implication of this broad reading is that Hall's initial violation of the rules would justify any subsequent warrantless search for hidden children, no matter how removed from the original complaint. As "searches and seizures inside a home without a warrant are presumptively unreasonable," *Groh v. Ramirez*,

540 U.S. 551, 559 (2004), such a broad construction of the consent provision is objectively unreasonable.

Unlike the first search, the second search followed an anonymous complaint that Hall was operating her group child care home without an assistant caregiver; the complaint did not include an allegation that Hall was hiding children or was out of ratio. Upon entering the child care home, Sweet and Sinnamon observed that, contrary to the complaint, there was an assistant caregiver present. Despite Hall's apparent compliance with the rules, Sweet and Sinnamon conducted a second inspection of the Hall family's private residence areas searching for hidden children. The majority's approval of this search based on the consent provision suggests that the consent provision authorizes DHHS employees to conduct warrantless searches of the private areas of a child care home so long as a licensee has ever been in violation of the licensing rules. In other words, because Hall was once found to be over-capacity, DHHS employees were free to search her private residence areas whenever they wanted. This construction of the consent provision is not reasonable. Thus, the warrantless search cannot be justified under the consent provision, and was not reasonable under the Fourth Amendment.

Further, I disagree with the majority's conclusion that the law was not clearly established as to whether social workers are subject to the Fourth Amendment's warrant requirements. The majority correctly identifies *Andrews* as the controlling precedent on this issue. There, this court reaffirmed that to determine whether there was a clearly established right, "a district court looks to binding precedent by the Supreme Court, its court of appeals or itself." *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 862 n.7 (6th Cir. 2012). "[W]e look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Id.* at 853. As the majority notes, the Western District of

Michigan, where this case originated, held in 2004 that "the Fourth Amendment applies to [social workers], as it does to all other officers and agents of the state[.] . . . There is . . . no social worker exception to the strictures of the Fourth Amendment.'" *O'Donnel v. Brown*, 335 F. Supp. 2d 787, 802 (W.D. Mich. 2004) (internal quotation marks omitted). Since *O'Donnel* predated the challenged searches, it is sufficient to create a clearly established constitutional right in this context. This is especially true considering many other circuits had already decided that social workers are not exempt from the Fourth Amendment. *See, e.g., Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 420 (5th Cir. 2008) ("We begin by noting that it is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations."); *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("Thus, the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees."); *Roska v. Peterson*, 328 F.3d 1230, 1242 (10th Cir. 2003) ("Measured against this parental interest, the state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment."); *Calabretta v. Floyd*, 189 F.3d 808, 816 (9th Cir. 1999) ("[Precedent] does not hold that the social worker may enter the home despite the absence of consent or exigency."); *Lenz v. Winburn*, 51 F.3d 1540 (11th Cir. 1995); *Wildauer v. Frederick Cty.*, 993 F.2d 369, 372 (4th Cir. 1993) (applying the Fourth Amendment to social workers but adding that lesser scrutiny applies to non-criminal "investigative home visits"). This large body of circuit authority, coupled with at least one case from the Western District of Michigan, clearly established at the time of the searches that social workers are subject to the Fourth Amendment's strictures.

Because the second search violated Hall's clearly established Fourth Amendment rights, I would affirm the district court's denial of qualified immunity as to that search and remand for further proceedings.